In re Alison J. TRECO & David Patrick Hamilton, As Liquidators of Meridien International Bank Limited (In Liquidation), Debtors.

The Bank of New York & JCPL Leasing Corp., Appellants,

v.

Alison J. Treco & David Patrick Hamilton, Liquidators of Meridien International Bank Limited (in Liquidation), Appellees.

No. 99–5074.

United States Court of Appeals, Second Circuit.

Argued June 14, 2000.

Decided Feb. 14, 2001.

150

trict of New York pursuant to 11 U.S.C. § 304(a) seeking the turnover of certain funds maintained by the appellants, the Bank of New York and JCPL Leasing Corp. (collectively "BNY").[1] After the Liquidators moved for partial summary judgment, the bankruptcy court (James L. Garrity, Jr., *Bankruptcy Judge*) granted the motion and directed turnover. *See In re Treco*, 229 B.R. 280 (Bankr.S.D.N.Y. 1999) ("*Treco I*"). The United States District Court for the Southern District of New York (Allen G. Schwartz, *District Judge*) affirmed. *See In re Treco*, 239 B.R. 36 (S.D.N.Y.1999) ("*Treco II*"). The bankruptcy court and district court both held that turnover was appropriate under 11 U.S.C. § 304(c) irrespective of whether BNY's claim to the funds held by it is secured. We disagree. We conclude that if BNY's claim is secured, turnover of these funds would be improper because of the extent to which the distribution of the proceeds of these funds in the Bahamian bankruptcy proceeding would not be "substantially in accordance with the order prescribed by" the United States Bankruptcy Code. 11 U.S.C. § 304(c)(4). We therefore vacate the district court's judgment and remand for a determination of whether or not BNY's claim is secured.

Richard G. Haddad (Daniel Wallen, Frederick M. Klein, of counsel), Otterbourg, Steindler, Houston & Rosen, P.C., New York, NY, for Appellants.

Melvin A. Brosterman (Michele L. Pahmer, Moshe Sasson, of counsel), Stroock & Stroock & Lavan, New York, NY, for Appellees.

Bruce E. Clark, Sullivan & Cromwell, New York, N.Y. (H. Rodgin Cohen, William L. Farris, Norman R. Nelson, of counsel) submitted a brief for Amicus Curiae The New York Clearing House Association L.L.C.

Before KEARSE and SACK, Circuit Judges, and HURD, District Judge.*

SACK, Circuit Judge:

Appellees Alison J. Treco and David Patrick Hamilton (the "Liquidators"), the liquidators of Meridien International Bank Limited ("MIBL"), a bank incorporated in the Bahamas undergoing bankruptcy proceedings there, filed a petition in the Bankruptcy Court for the Southern Dis-

## BACKGROUND

In the first months of 1995, a network of twenty-one banks located primarily in Africa and controlled by MIBL began to experience severe liquidity problems. On April 25, 1995, the Supreme Court of the Bahamas placed MIBL into involuntary liquidation and appointed Alison J. Treco and David Patrick Hamilton, both partners of KPMG Peat Marwick working out of its Bahamas office, as MIBL's liquidators.

* The Honorable David N. Hurd, of the United States District Court for the Northern District of New York, sitting by designation.

1. The Bank of New York and JCPL Leasing Corp. are a subsidiary and an affiliate, respectively, of The Bank of New York Company, Inc.

For several years prior to these events, MIBL had enjoyed a close relationship with BNY. BNY acted as MIBL's correspondent bank in the United States, providing it and several of its subsidiaries account services, loans, and other financial accommodations. On June 15, 1993, BNY and MIBL entered into an agreement (the "MIBL Pledge Agreement") pursuant to which MIBL pledged its account with BNY and "all [its] other present and future accounts on [BNY's] books" as security for all of MIBL's "present and future obligations and liabilities" to BNY. MIBL also promised under the agreement to reimburse BNY for "costs and expenses, including attorneys' fees and disbursements, incurred" in protecting its security interest, and agreed "that all proceedings relating hereto shall be brought in courts located within" New York City.

The next year, MIBL requested from BNY certain financial accommodations—primarily in the form of overdrafts on certain of its operating accounts at BNY—in the amount of $15.15 million to be secured by funds newly deposited at BNY by one of MIBL's subsidiaries, Meridien BIAO Bank Tanzania Limited ("Meridien Tanzania"). BNY agreed on the condition that Meridien Tanzania and MIBL sign a second agreement (the "Meridien Tanzania Agreement") according to which Meridien Tanzania would pledge certain of its accounts to BNY as security. This agreement was signed on November 15, 1994.

MIBL subsequently defaulted on its obligation to repay the $15.15 million. To satisfy this obligation, BNY liquidated Meridien Tanzania's pledged account in the amount of $15.15 million between January and March 1995. But in early April 1995, the Central Bank of Tanzania appointed a manager to operate Meridien Tanzania. The manager questioned the validity of the Meridien Tanzania Agreement and demanded return of the $15.15 million that BNY had taken.

After MIBL was placed in bankruptcy in the Bahamas in late April 1995, BNY commenced a suit in June 1995 against MIBL, Meridien Tanzania and several other subsidiaries of MIBL, in the United States District Court for the Southern District of New York, seeking, *inter alia*, (1) a declaratory judgment that BNY, not Meridien Tanzania, had the right to the $15.15 million that BNY had liquidated, or, (2) if it did not prevail with respect to the Meridien Tanzania accounts, an order permitting BNY to retain approximately $600,000 remaining in MIBL's accounts with BNY.

On September 29, 1995, the Liquidators initiated a separate proceeding, filing a petition on behalf of MIBL in the Bankruptcy Court for the Southern District of New York pursuant to 11 U.S.C. § 304(a). "Section 304(a) authorizes a 'foreign representative' in a 'foreign [bankruptcy] proceeding' to commence a '[c]ase ancillary to [that] proceeding' in a United States bankruptcy court to protect the administration of the foreign proceeding." *In re Koreag, Controle et Revision S.A.*, 961 F.2d 341, 348 (2d Cir.1992) ("*Koreag*") (quoting § 304(a)) (alterations in original). Among the forms of relief authorized by § 304 are an injunction prohibiting actions against the debtor and the "turnover" of property to a foreign representative. *See* 11 U.S.C. § 304(b)(1), (2). In their petition, the Liquidators requested, *inter alia*, that all judicial actions against MIBL be enjoined and that "all persons or entities possessing MIBL's assets ... turn over those assets, or the proceeds thereof, to [the Liquidators]."

On March 12, 1996, the bankruptcy court preliminarily enjoined further proceedings involving MIBL in BNY's district court action. That action proceeded to trial before then-District Judge Sonia Sotomayor as to the other defendants, however. Then, on June 22, 1998, while the case was *sub judice*, BNY entered into a settlement agreement pursuant to which BNY agreed, *inter alia*, to pay $4 million to Meridien Tanzania's assignee, Deposit Insurance Board ("DIB"), which had appeared and answered in the action. As part of the agreement, BNY was assigned all DIB's rights of subrogation with respect to the MIBL accounts.

In the bankruptcy court, meanwhile, the Liquidators moved for partial summary judgment directing turnover of the $600,000 remaining in MIBL's accounts at BNY and being held by BNY. BNY opposed the motion on several grounds, asserting that it rightfully held the $600,000 as security for two secured debts owed by MIBL: (1) the $4 million BNY had agreed to pay DIB as part of the settlement agreement, together with related attorneys' fees; and (2) any of DIB's claims against MIBL that had been assigned to BNY pursuant to the settlement agreement. As of May 1998, MIBL's estate contained approximately $1.75 million.

The bankruptcy court granted the Liquidators' partial summary judgment motion in a January 22, 1999 decision holding, *inter alia:* (1) that BNY's purported status as a secured creditor would not bar turnover because "Bahamian law recognizes security interests in property," *Treco I,* 229 B.R. at 292; (2) that turnover under § 304 is not contingent on the provision of "adequate protection" to BNY's interest, *id.*; (3) that § 304 does not preserve any "right of setoff" BNY might possess, *id.* at 290, 292–93; and (4) that the Bahamian liquidation proceeding complies with the requirements for turnover set out in § 304(c), *see id.* at 293–301.

In a September 10, 1999 Opinion and Order, the district court affirmed the bankruptcy court's order for substantially the same reasons. *See Treco II,* 239 B.R. 36. Judge Schwartz explicitly declined, however, to "address whether any common law or contractual right of BNY's to set-off is preserved, because any set-off claim may be fully addressed by the Bahamian court." *Id.* at 44.

This appeal followed.

## DISCUSSION

### I. Turnover Under 11 U.S.C. § 304

*A. The Statutory Framework and Standard of Review*

Section 304 of the Bankruptcy Code, enacted as part of the Bankruptcy Reform Act of 1978, "was intended to deal with the complex and increasingly important problems involving the legal effect the United States courts will give to foreign bankruptcy proceedings." *Cunard S.S. Co. v. Salen Reefer Servs. AB,* 773 F.2d 452, 454 (2d Cir.1985). Of particular relevance to this appeal, § 304 addresses situations in which a bankruptcy proceeding has been instituted in a foreign country and the debtor has assets in the United States. As the district court observed, *see Treco II,* 239 B.R. at 41 & n. 7, courts and commentators have identified two general approaches to distributing assets in such proceedings. Under the "territoriality" approach, or the "Grab Rule," the court in each jurisdiction where the debtor has assets distributes the assets located in that jurisdiction pursuant to local rules. Under the "universality" approach, a primary insolvency proceeding is instituted in the debtor's domiciliary country, and ancillary courts in other jurisdictions—typically in jurisdictions where the debtor has assets—defer to the foreign proceeding and in effect collaborate to facilitate the centralized liquidation of the debtor's estate according to the rules of the debtor's home country. *See id; In re Hourani,* 180 B.R. 58, 63–64 & n. 9 (Bankr.S.D.N.Y.1995); *In re Maxwell Communication Corp.,* 170 B.R. 800, 816 (Bankr.S.D.N.Y.1994), *aff'd,* 186 B.R. 807 (S.D.N.Y.1995), *aff'd,* 93 F.3d 1036 (2d Cir. 1996); 2 *Collier on Bankruptcy* ¶ 304.01[2] (Lawrence P. King ed., 15th ed. 2000); Jay Lawrence Westbrook, *A Global Solution to Multinational Default,* 98 Mich. L. Rev. 2276, 2282 (2000); Stuart A. Krause, *et al., Relief Under Section 304 of the Bankruptcy Code: Clarifying the Principal Role of Comity in Transnational Insolvencies,* 64 Fordham L. Rev. 2591, 2591–92 (1996); Melissa S. Rimel, *American Recognition of International Insolvency Proceedings: Deciphering Section 304(c),* 9 Bankr.Dev. J. 453, 456 (1992).[2]

The enactment of § 304 was a step toward the universality approach. *See, e.g., Koreag,* 961 F.2d at 358 ("[T]he overriding purpose of § 304 is to prevent piecemeal distribution of a debtor's estate."); *Cunard S.S. Co.,* 773 F.2d at 455 ("[S]ection 304 may be said to have been designed to accommodate the problems . . . in which foreign bankruptcy proceedings have been instituted and creditors are attempting to seize assets of the debtor located in the United States."); *In re Maxwell Communication Corp.,* 170 B.R. at 816 (Section 304 embraces "a modified form of universalism accepting the central premise of universalism, that is, that assets should be collected and distributed on a worldwide basis, but reserving to local courts discretion to evaluate the fairness of home country procedures and to protect the interests of local creditors."); 2 *Collier on Bankruptcy* ¶ 304.01[2]; Jay Lawrence Westbrook, *Choice of Avoidance Law in Global Insolvencies,* 17 Brook. J. Int'l L. 499, 517 (1991) (citing § 304 as "[t]he leading example" of modified universalism); Krause, *et al., supra,* at 2595–96; Rimel, *supra,* at 480–81. Section 304 allows a "foreign representative," 11 U.S.C. § 304(a), such as a liquidator in a foreign insolvency proceeding, to institute an ancillary proceeding in the United States to obtain an injunction prohibiting suits or enforcement of judgments against the debtor or its property, *see id.,* § 304(b)(1)(A), (B), turnover of the property of the debtor's estate to the foreign liquidators, *see id.,* § 304(b)(2), or "other appropriate relief," *id.,* § 304(b)(3). These remedies are intended to ensure the "economical and expeditious administration of [the foreign debtor's] estate." *Id.,* § 304(c).

Section 304 does not implement pure universality, however. The statute expressly directs courts to consider several factors before deferring to the foreign court and granting relief in support of foreign proceedings:

> In determining whether to grant relief under subsection (b) of this section [which includes turnover], the court shall be guided by what will best assure an economical and expeditious administration of such estate, consistent with—
>
> (1) just treatment of all holders of claims against or interests in such estate;
>
> (2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;
>
> (3) prevention of preferential or fraudulent dispositions of property of such estate;
>
> (4) distribution of proceeds of such estate substantially in accordance with the order prescribed by this title;
>
> (5) comity; and
>
> (6) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

11 U.S.C. § 304(c).

The plain language of this provision, repeatedly using the term "such estate" to direct the bankruptcy courts to focus their analysis on the particular estate in bankruptcy being considered, requires the courts to conduct a case-by-case balancing of the statutory factors. The House Report accompanying the bill that included what later became § 304 confirms that "[t]hese guidelines are designed to give the court the maximum flexibility in handling ancillary cases. . . . [T]he court [should] make the appropriate orders under all of the circumstances of each case, rather than being provided with inflexible rules." H.R. Rep. No. 95–595, at 324–25 (1977). As the courts have subsequently

---

**2.** A third approach called contractualism, in which a corporation may specify in its charter the jurisdiction that will administer its bankruptcy, has been advocated in academic literature. *See, e.g.,* Robert K. Rasmussen, *Resolving Transnational Insolvencies Through Private Ordering,* 98 Mich. L. Rev. 2252, 2254–55 (2000).

recognized, § 304 by its terms requires an exercise of judicial discretion. *See, e.g., Koreag,* 961 F.2d at 359; *Cunard S.S. Co.,* 773 F.2d at 459–60; *In re Manning,* 236 B.R. 14, 19 (9th Cir.BAP 1999); *Vesta Fire Ins. Corp. v. New Cap Reinsurance Corp.,* 244 B.R. 209, 212 (S.D.N.Y.2000).

 We therefore review the bankruptcy court's analysis of the § 304(c) factors and its decision to order turnover for abuse of discretion. *See In re Manning,* 236 B.R. at 19; *cf. Finanz AG Zurich v. Banco Economico S.A.,* 192 F.3d 240, 246 (2d Cir.1999) (noting, in a non-§ 304 proceeding, that "[w]e review a district court's decision to extend or deny comity to a foreign proceeding for abuse of discretion"). To the extent that our decision turns on questions of statutory interpretation, however, our review is *de novo. See Koreag,* 961 F.2d at 347–48. In addition, with respect to the grant of partial summary judgment, the posture in which this appeal reaches us, we review *de novo* whether, viewing the record in the light most favorable to the non-movant, here BNY, any genuine and disputed issue of material fact underlies the bankruptcy court's decision. *See In re Blackwood Assocs.,* 153 F.3d 61, 67 (2d Cir.1998).

*B. Analysis of the § 304(c) Factors*

The primary dispute on appeal is whether the bankruptcy and district courts properly analyzed the factors under § 304(c) in deciding whether to grant turnover. Although BNY contends that § 304(c)(1), just treatment of all claim holders, and § 304(c)(2), protection of United States claim holders against prejudice and inconvenience, militate against granting turn-

over, its most forceful argument rests on § 304(c)(4), which directs the court to consider whether the "distribution of proceeds" of the debtor's estate in the foreign proceeding would be "substantially in accordance with the order prescribed by" the United States Bankruptcy Code.

 BNY points out that its secured claim[3] will be subordinated under Bahamian law to, among other things,[4] the administrative expenses of liquidation. Under United States law, by contrast, "a secured creditor's interest is generally not subject to diminution based on administrative expenses." *In re Blackwood Assocs.,* 153 F.3d at 68. "[A]bsent an agreement to the contrary, a secured creditor's collateral may only be charged [under 11 U.S.C. § 506(c)] for administrative expenses, including attorney's fees, to the extent these expenses directly benefitted that secured creditor."[5] *Id.; see also In re Flagstaff Foodservice Corp.,* 762 F.2d 10, 12 (2d Cir.1985).

BNY argues that in light of the extent to which the "distribution of proceeds of [MIBL's] estate" in the Bahamian proceedings would depart from "the order prescribed by" the United States Bankruptcy Code, § 304(c)(4) bars turnover. BNY further argues that the district court erred in treating the principle of comity set forth in § 304(c)(5) as the conclusive factor outweighing any discrepancy between United States and Bahamian law regarding the priority of claims for administrative expenses and secured claims.

The Liquidators do not dispute that secured claims are subordinated to administrative expenses under Bahamian law. As

---

**3.** We assume, for the time being, as did the bankruptcy and district courts, that BNY's claim is secured. We address the dispute regarding this issue in part I.D below.

**4.** According to Bahamian law, payment of taxes, payment of pre-petition wages, and payment of compensation for personal injuries also have priority over secured claims, but that apparently has little impact on BNY,

which focuses solely on the relative priority of administrative costs and expenses.

**5.** Section 506(c) of the Bankruptcy Code provides that "[t]he trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim." 11 U.S.C. § 506(c).

stated in a declaration by MIBL's Bahamian counsel, under § 267(1) of The Bahamas Companies Act of 1992, the Bahamian law governing MIBL's liquidation proceedings, funds are distributed to secured creditors *after* the retention of "such sums as may be necessary for the costs and expenses of the winding up." The Liquidators argue, however, that comity is the most important factor under § 304(c) and that comity therefore trumps BNY's claim that it will be materially disadvantaged by the relative priority of its secured claim under Bahamian law. The Liquidators also cite two cases in which relief under § 304 has been granted after a finding that "the liquidation laws of the Bahamas are in harmony with those of the United States and must be afforded comity." *In re Culmer*, 25 B.R. 621, 632 (Bankr. S.D.N.Y.1982); *see also In re Hackett*, 184 B.R. 656, 659 (Bankr.S.D.N.Y.1995) ("Bahamian liquidation laws and procedures ... comport with section 304(c) of the Bankruptcy Code and the principle of equality of distribution.").

In assessing these competing arguments, we note at the outset that we are not bound by the decisions affording comity to Bahamian bankruptcy proceedings in *In re Culmer* and *In re Hackett*, not only because bankruptcy court decisions are not binding on us, but also because § 304(c) calls for a case-specific exercise of discretion in light of all of the circumstances. *See* H.R. Rep. No. 95–595, at 324–25 (1977) ("[T]he court [must] be permitted to make the appropriate orders under all of the circumstances of each case, rather than being provided with inflexible rules."). Although some of the considerations in determining whether to defer to a certain country's bankruptcy proceedings may be constant from case to case, other factors vary. The case at bar, for example, involves an allegedly secured claim; *In re Culmer* and *In re Hackett*, by contrast, did not. *See also Koreag*, 961 F.2d at 359 (holding that comity required turnover pursuant to § 304 of unsecured assets held by U.S. creditor in aid of Swiss bankruptcy proceeding).

We do not quarrel with the view of the Liquidators, shared by many courts,[6] that comity is the ultimate consideration in determining whether to provide relief under § 304. The purpose of the section is to provide a statutory mechanism through which United States courts may defer to and facilitate foreign insolvency proceedings. As we observed in *Koreag*, "the overriding purpose of § 304 is to prevent piecemeal distribution of a debtor's estate." 961 F.2d at 358; *see also* H.R. Rep. No. 95–595, at 324–25 (1977) (noting, even before comity was added to § 304(c) as a factor, that "[p]rinciples of international comity and respect for the judgments and laws of other nations" underlie § 304). But comity does not, as the Liquidators suggest, automatically override the other specified factors. Rather, a court's function under § 304 is to determine whether comity should be extended to the foreign proceeding in light of the other factors. *See In re Koreag, Controle et Revision S.A.*, 130 B.R. 705, 712 (Bankr. S.D.N.Y.1991) ("[T]he other factors are ... inherently taken into account when considering comity."), *vacated on other*

6. *See, e.g., Interpool, Ltd. v. Certain Freights of the M/V Venture Star*, 102 B.R. 373, 377 (D.N.J.1988); *In re Culmer*, 25 B.R. at 629; *In re Koreag Controle et Revision S.A.*, 130 B.R. 705, 712 (Bankr.S.D.N.Y.1991) *vacated on other grounds*, 961 F.2d 341 (2d Cir.1992); *In re Axona Int'l Credit & Commerce Ltd.*, 88 B.R. 597, 609 (Bankr.S.D.N.Y.1988); *In re Metzeler*, 78 B.R. 674, 677 (Bankr.S.D.N.Y. 1987); *In re Gee*, 53 B.R. 891, 901 (Bankr. S.D.N.Y.1985); *see also Krause, et al., supra*, at 2609–10; *Rimel, supra*, at 456–57, 480–81; Hon. Burton R. Lifland, *Suggested Modification to Ancillary Proceeding Statutes*, 4 Am. Bankr. Inst. L. Rev. 530, 530 (1996). A minority of courts has maintained that comity should not be weighed more heavily than the other factors. *See, e.g., In re Papeleras Reunidas S.A.*, 92 B.R. 584, 594 (Bankr.E.D.N.Y. 1988); *see also Collier on Bankruptcy* ¶ 304.08[5][b]; Stacy A. Morales & Barbara A. Deutcsh, *Bankruptcy Code Section 304 and U.S. Recognition of Foreign Bankruptcies: The*

*grounds,* 961 F.2d 341 (2d Cir.1992). The statute plainly provides that the other factors may form the basis for denying relief, and thus denying comity, in some cases.[7]

■ Familiar principles of statutory construction support the rejection of the Liquidators' argument. Were we to conclude that principles of deference categorically outweighed differences in the order of priority accorded various types of creditors, then § 304(c)(4) would be effectively eliminated from the statute, violating "our duty to give effect, if possible, to every clause and word of a statute." *United States v. Gitten,* 231 F.3d 77, 80 (2d Cir. 2000) (quoting *United States v. Menasche,* 348 U.S. 528, 538–39, 75 S.Ct. 513, 99 L.Ed. 615 (1955)) (internal quotation marks omitted).

We therefore disagree with the Liquidators' premise that this case can be decided by determining, in the abstract, whether comity, as codified in § 304(c)(5), is more important than the order of priority for creditors, as set forth in § 304(c)(4). We think the proper question to ask is whether § 304(c)(4), along with the other factors, requires the court to deny turnover in the circumstances of this particular case, despite the general "universality" approach favoring extension of comity that § 304 is meant to advance and despite its goal of assuring an "economical and expeditious administration" of foreign estates. 11 U.S.C. § 304(c).

*Tyranny of Comity,* 39 Bus. Law. 1573, 1588 (1984).

7. Section 304, as originally introduced in both houses of Congress, contained no explicit reference to comity. *See Cunard S.S. Co.,* 773 F.2d at 456 (citing legislative history). Comity probably did not need to be listed as a separate factor because granting relief under § 304 is itself an extension of comity. The subsequent inclusion of comity as a specific factor "clarif[ied]" and emphasized that Congress wanted courts to afford comity to foreign bankruptcy proceedings. *Id.; see* 124 Cong. Rec. 11,091 (1978) ("Section 304(c) is modified to indicate that the court shall be guided by considerations of comity in addition to the other factors specified therein.").

■ The principle of comity has never meant categorical deference to foreign proceedings. It is implicit in the concept that deference should be withheld where appropriate to avoid the violation of the laws, public policies, or rights of the citizens of the United States. *See Pravin Banker Assocs. v. Banco Popular Del Peru,* 109 F.3d 850, 854 (2d Cir.1997) (comity should not be extended "when doing so would be contrary to the policies or prejudicial to the interests of the United States"); *Victrix S.S. Co. v. Salen Dry Cargo A.B.,* 825 F.2d 709, 713 (2d Cir.1987) ("Federal courts generally extend comity whenever the foreign court had proper jurisdiction and enforcement does not prejudice the rights of United States citizens or violate domestic public policy."); *Cunard S.S. Co.,* 773 F.2d at 457 ("Comity will be granted ... if ... the laws and public policies of the forum state and the rights of its residents will not be violated."); *In re Schimmelpenninck,* 183 F.3d 347, 365 (5th Cir. 1999) ("foreign laws ... must not be repugnant to our laws and policies").

■ The classic definition of comity was provided by the Supreme Court more than a century ago:

"Comity," in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty

At least two commentators have proposed modifying the language of § 304(c) to clarify that a court's task under § 304 is to determine "whether to afford comity to a foreign proceeding" in light of the other five factors. Krause, *et al., supra,* at 2609–11; *see also* Lifland, *supra,* (endorsing the modification suggested by Krause, *et al.*). The proposal would eliminate comity as a factor and instead emphasize its primacy by inserting it in the preamble of § 304(c) as follows: "[T]he court shall be guided by what will best assure an economical and expeditious administration of such estate, consistent with principles of comity, considering all of the following...." *Id.* at 2611.

and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws. *Hilton v. Guyot,* 159 U.S. 113, 141, 16 S.Ct. 139, 40 L.Ed. 95 (1895). In this case, of course, § 304(c) supplants the federal common law comity analysis conducted by courts pursuant to *Hilton.*[8] It directs courts instead to use the statutory factors to balance the reasons for and against affording comity. But the statutory factors reflect the considerations that "have historically been considered within a court's determination whether to afford comity to a proceeding in a foreign nation." *In re Culmer,* 25 B.R. at 629. And application of those factors requires that comity not be extended in some circumstances.

### C. Application of § 304(c) to this Case

■ The first three factors of § 304(c) instruct courts to consider refusing deference to the foreign proceeding if such proceeding does not provide for the just treatment of all claimholders; if it prejudices or inconveniences American claimholders; or if it inadequately protects against the risks of preferential or fraudulent disposition of the estate. *See* 11 U.S.C. § 304(c)(1)-(3). We agree with the Liquidators and the district and bankruptcy courts that the first three factors present no bar to affording comity to the proceedings in the Bahamas. First, "§ 304(c)(1) is satisfied because the [applicable Bahamian law] provides for a comprehensive procedure for the orderly and equitable distribution of MIBL's assets among all of its creditors." *Treco I,* 229 B.R. at 294. Second, "Bahamian law ... complies with § 304(c)(2) because [it] protects U.S. claimholders from prejudice and inconvenience in the processing of their claims." *Id.* at 295. And third, Bahamian

law prevents preferential and fraudulent dispositions of property and thus satisfies § 304(c)(3). *See id.* at 296. *See also In re Hackett,* 184 B.R. at 659 ("Bahamian liquidation laws and procedures ... comport with section 304(c) of the Bankruptcy Code and the principle of equality of distribution."); *In re Culmer,* 25 B.R. at 629–31 (holding that Bahamian law satisfies § 304(c)(1)-(3)). There being no reason to doubt that the insolvency proceeding in the Bahamas will be fair, impartial, procedurally sound, and free from fraud, there is no question that comity would be extended and the turnover order issued if our scrutiny of Bahamian bankruptcy law were limited to these considerations.

■ But Congress, by including subsection (4) in § 304(c), has directed the courts to look beyond these "macro systemic concepts." 2 *Collier on Bankruptcy* ¶ 304.08[5][b] at 304–37. Section 304(c)(4) represents a legislative choice to require courts to consider differences between American priority rules and those applicable to the foreign proceeding in determining whether affording comity will be repugnant to American public policies.

■ In assessing the impact of § 304(c)(4) here, we begin by recognizing that the priority rules of a foreign jurisdiction need not be identical to those of the United States. *See In re Schimmelpenninck,* 183 F.3d at 365; *Interpool, Ltd. v. Certain Freights of the M/V Venture Star,* 102 B.R. 373, 378 (D.N.J.1988); *In re Axona Int'l Credit & Commerce Ltd.,* 88 B.R. 597, 610 (Bankr.S.D.N.Y.1988); *In re Culmer,* 25 B.R. at 631. The plain language of § 304(c)(4) directs the court to consider whether the priority rules are "*substantially* in accordance" with United States law. (Emphasis added). Because the

---

8. The Second Circuit has decided a number of cases involving foreign bankruptcy proceedings based on principles of comity as developed by federal common law. *See, e.g., Finanz AG Zurich v. Banco Economico S.A.,* 192 F.3d 240 (2d Cir.1999); *In re Maxwell Communication Corp.,* 93 F.3d 1036, 1048 (2d Cir.1996); *Allstate Life Ins. Co. v. Linter Group Ltd.,* 994 F.2d 996, 998–1000 (2d Cir. 1993); *Victrix S.S. Co.,* 825 F.2d at 713–15; *Cunard S.S. Co.,* 773 F.2d at 456–60. Although these cases inform our understanding of comity, our decision must ultimately rest on the statutory provision, § 304(c).

same foreign priority rules may be "substantially in accordance" with United States law as applied in some circumstances but not as applied in others, a comparison of the priority rules cannot be conducted in the abstract. A court must consider the effect of the difference in the law on the creditor in light of the particular facts presented. An unsecured creditor could not, for example, oppose turnover on the ground that the foreign jurisdiction treats secured claims dramatically less favorably than does United States law.

The district court relied on the abstract observation that Bahamian law recognizes a distinction between secured and unsecured claims. But that distinction does not change the fact that United States law and Bahamian law treat administrative expenses differently—a difference that would apparently have a substantial impact on BNY's claim. The district court acknowledged that the prioritization of administrative expenses over secured claims "ultimately may be detrimental to the interests of a secured claimant" under Bahamian law, *Treco II*, 239 B.R. at 42, but found that this factor was "not sufficient to render turnover inconsistent with § 304(c)(4)," *id.* at 41. We disagree. The difference in prioritization under U.S. and Bahamian law is particularly acute in this case because of the strong possibility that MIBL's estate will have little or no funds after payment of administrative expenses. The Liquidators testified in depositions that as of May 1998 they had collected approximately $10 million in receivables, but only $1.75 million remained in the estate because nearly $8 million had been used to pay administrative expenses. Such expenses consisted of the Liquidators' fees—

at a premium rate fifty percent above their usual rates—their staff's fees, their attorneys' fees, and travel and other expenses. What is more, these payments are apparently disbursed as a matter of bureaucratic routine "by the registrar" without notice to creditors, rather than pursuant to the approval of a judge. Meanwhile, no money has yet been paid to creditors.

The Liquidators were unable to estimate when there would be distribution to creditors, how much creditors would receive, or when the MIBL bankruptcy proceeding would conclude. It is clear, however, that as of May 1998 the Liquidators' fees will continue depleting the estate because only thirty percent of the approximately $300 million in claims against the estate had been resolved (i.e., admitted or rejected). Viewing this evidence in the light most favorable to BNY, it appears probable that BNY would recover only a fraction, if any, of the $600,000 it holds as a secured creditor if it were ordered to turn over those funds. This is in stark contrast to American law, which would diminish BNY's claim only by those administrative expenses that "directly benefitted" BNY. *Blackwood*, 153 F.3d at 68. As far as we can tell, then, the "distribution of proceeds of [MIBL's] estate" in the Bahamian proceedings would thus *not* be "substantially in accordance with the order prescribed by" United States law. 11 U.S.C. § 304(c)(4).

One consideration that informs our analysis of § 304(c)(4) and weighs against turnover is the special protected status that secured creditors enjoy under United States law.[9] *See* 4 *Collier on Bankruptcy*

9. The status enjoyed by secured creditors under United States bankruptcy law has attracted substantial academic criticism and defense. *Compare, e.g.,* Lucian Arye Bebchuk & Jesse M. Fried, *The Uneasy Case for the Priority of Secured Claims in Bankruptcy*, 105 Yale L.J. 857, 934 (1996) (arguing that the rule of full priority "causes excessive use of security interests, reduces the incentive of firms to take adequate precautions and choose appro-

priate investments, and distorts the monitoring arrangements chosen by firms and their creditors"), John Hudson, *The Case Against Secured Lending*, 15 Int'l Rev. L. & Econ. 47, 53–55 (1995) (taking the position that full priority allows a firm to continue to operate inefficiently), Thomas H. Jackson & Robert E. Scott, *On the Nature of Bankruptcy: An Essay on Bankruptcy Sharing and the Creditors' Bargain*, 75 Va. L. Rev. 155, 169–73 (1989) (con-

¶ 506.02 at 506–6 ("As a general matter, the Code recognizes and prescribes a number of special rights and protections for the holders of secured claims."). Indeed, security interests have been recognized as property rights protected by our Constitution's prohibition against takings without just compensation. *See* U.S. Const. amend. V; *United States v. Security Indus. Bank*, 459 U.S. 70, 75, 103 S.Ct. 407, 74 L.Ed.2d 235 (1982); *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 602, 55 S.Ct. 854, 79 L.Ed. 1593 (1935); *id.* at 589, 55 S.Ct. 854 ("[T]he position of a secured creditor, who has rights in the specific property, differs fundamentally from that of an unsecured creditor, who has none."); *In re George Ruggiere Chrysler–Plymouth, Inc.*, 727 F.2d 1017, 1019 (11th Cir.1984). We do not mean to suggest that turnover under § 304 of property subject to a security interest is an unconstitutional taking, a subject we discuss in part II.A, below. But our observation that security interests enjoy constitutional protection supports our conclusion that United States law affords strong protection to secured creditors and treats those protections very seriously, a conclusion that, in turn, amplifies the significance of the difference in the way secured claims are treated under Bahamian law.

The Liquidators cite no cases—and we are aware of none—ordering turnover of assets under § 304 from a creditor with a secured claim. To the contrary, several bankruptcy courts have refused to grant relief under § 304 where the priority of secured creditors was not recognized under the law of the foreign jurisdiction. *See*

*In re Hourani*, 180 B.R. at 69 (denying turnover where Jordanian law failed, among other things, to distinguish between secured and unsecured claims); *In re Papeleras Reunidas, S.A.*, 92 B.R. 584, 593 (Bankr.E.D.N.Y.1988) (denying relief under § 304 because, *inter alia*, a judgment lien creditor, a secured creditor under United States law, would be treated as an unsecured creditor under Spanish law and would therefore receive nothing in the Spanish proceeding because there were no funds in the estate for unsecured creditors); *In re Toga Mfg. Ltd.*, 28 B.R. 165, 168–70 (Bankr.E.D.Mich.1983) (denying turnover and injunctive relief where a judgment lien creditor would be treated as an unsecured creditor under Canadian law); *cf. Koreag*, 961 F.2d at 359 (observing that the deprivation of a "valid security interest or other benefit of domestic law ... might render a turnover unfair or otherwise improper") (dictum); *Cunard S.S. Co.*, 773 F.2d at 459 (affirming, in a non-§ 304 proceeding, vacatur of creditor's attachment of Swedish debtor's United States property on the ground of comity, in part because the creditor's claim was not secured and that there was therefore "no compelling policy reason for a general creditor ... to receive preference over other creditors").

The Bahamian rule that secured creditors do not have priority over administrative expenses threatens to destroy BNY's claim. We therefore conclude that the bankruptcy court abused its discretion by ordering turnover without first determining that in the discrete context of BNY's

cluding that full priority encourages secured creditor misbehavior on the eve of bankruptcy), Lynn M. LoPucki, *The Unsecured Creditor's Bargain*, 80 Va. L. Rev. 1887, 1952–54 (arguing that prioritization of secured claims deceives unsecured creditors), *and* Alan Schwartz, *The Continuing Puzzle of Secured Debt*, 37 Vand. L. Rev. 1051 (1984) (arguing that the law's favorable treatment of secured debt is without plausible support), *with* David Gray Carlson, *On the Efficiency of Secured Lending*, 80 Va. L. Rev. 2179, 2179 (1994)

("[I]t is easy to show that secured lending has at least the potential to create social good."), Steven L. Harris & Charles W. Mooney, Jr., *A Property Based Theory of Security Interests: Taking Debtors' Choices Seriously*, 80 Va. L. Rev.2021, 2021–22 (1994) (arguing that "[t]he law should not impair the ability of debtors to secure as much or as little of their debts with as much or as little of their existing and future property as they deem appropriate"), *and* Steven L. Schwarcz, *The Easy Case for the Priority of Secured Claims in Bankruptcy*, 47 Duke L.J. 425 (1997).

claim against MIBL's estate, the order of distribution under Bahamian law was "substantially in accordance with the order prescribed by" the United States Bankruptcy Code.[10]

We pause to underscore what should be clear from the preceding discussion. First, of course, we are not announcing a rule that whenever § 304(c)(4) is implicated, turnover or other § 304 relief should be denied. Second, we are not creating a presumption against affording comity to Bahamian bankruptcy proceedings. We expect that the case-specific analysis required by § 304 will in many or most cases support the granting of the requested relief. *See, e.g., In re Hackett,* 184 B.R. at 660; *In re Culmer,* 25 B.R. at 633.

*D. Whether BNY's Claim is Secured*

We have thus far assumed that BNY's claim is secured, an assumption upon which resolution of this case may depend. The bankruptcy court explicitly declined to resolve this question on the theory that even if BNY did possess a secured interest, turnover was appropriate under § 304. *See Treco I,* 229 B.R. at 286–87. The district court appears to have shared this view. *See Treco II,* 239 B.R. at 40–42. Because this question was not decided by the district court or the bankruptcy court and has not been fully briefed to us on appeal,[11] we decline to address it. We remand the case to the district court for resolution of this issue in the first instance. *See Schonfeld v. Hilliard,* 218 F.3d 164, 184 (2d Cir.2000).

**II. BNY's Other Arguments**

BNY makes three additional arguments: (1) that turnover violates BNY's rights under the Takings Clause, (2) that the bankruptcy and district courts improperly

failed to preserve BNY's right of setoff; and (3) that turnover would violate a forum selection clause contained in the MIBL Pledge Agreement. Because of our disposition of the § 304 issue, these alternative arguments are significant only if BNY's claim is unsecured.

*A. The Takings Clause*

The Fifth Amendment's Takings Clause prohibits the taking of "private property . . . for public use, without just compensation." U.S. Const. amend. V. BNY asserts that turnover would violate the Takings Clause by depriving it of "adequate protection" for the value of its secured claim. The bankruptcy court rejected this argument on the ground that 11 U.S.C. § 542, the section of the Bankruptcy Code providing for "adequate protection" of secured claims, does not apply to § 304 proceedings. *See Treco I,* 229 B.R. at 292. The district court also rejected this argument on the ground that "the value of BNY's security interest has never been absolute, but has always been limited as provided by the law in effect at the time of the signing of the MIBL Pledge Agreement." *Treco II,* 239 B.R. at 43.

Whatever the merits of BNY's argument, it is clear that it rests on the premise that BNY's claim is in fact secured. If the claim is unsecured, it is not "property" for purposes of the Takings Clause. *See, e.g., Radford,* 295 U.S. at 602, 55 S.Ct. 854. And if BNY's claim is secured, turnover would be barred under § 304 and we would not need to reach the constitutional issue. We therefore decline to address it. *See Horne v. Coughlin,* 178 F.3d 603, 605 (2d Cir.1999) ("[I]n addressing a constitutional question whose answer would have no effect on the outcome of the case, we

---

**10.** We do not consider the sixth factor of § 304(c), "the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns," 11 U.S.C. § 304(c)(6), because MIBL is not an individual. *See In re Schimmelpenninck,* 183 F.3d at 364 n. 46.

**11.** BNY nowhere explains on this appeal why its claim is secured, asserting instead that the Liquidators conceded in the bankruptcy court that its claim was secured, an assertion that the Liquidators vigorously dispute.

would have violated the 'fundamental and longstanding principle of judicial restraint [that] requires ... courts [to] avoid reaching constitutional questions in advance of the necessity of deciding them.'" (quoting *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988))) (alterations in *Horne*).

## B. Right of Setoff

BNY also argues that turnover is barred by 11 U.S.C. § 553(a), which preserves rights of setoff in bankruptcy proceedings. BNY contends that "by ordering that the pledged funds be paid and turned over to the foreign liquidators, the District Court destroyed BNY's right of offset by taking away from BNY the ability to effectuate the offset." Appellant's Br. at 35. As the Supreme Court has explained,

> The right of setoff (also called "offset") allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding the "absurdity of making A pay B when B owes A." Although no federal right of setoff is created by the Bankruptcy Code, 11 U.S.C. § 553(a) provides that, with certain exceptions, whatever right of setoff otherwise exists is preserved in bankruptcy.

*Citizens Bank v. Strumpf*, 516 U.S. 16, 18, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995) (citation omitted).

The bankruptcy court rejected BNY's argument that its setoff rights bar turnover, concluding, *inter alia*, that 11 U.S.C. § 553 does not apply in ancillary proceedings under § 304. *See Treco I*, 229 B.R. at 290. The district court also rejected BNY's argument, on the ground that whether BNY possesses a right of setoff is an issue that can be determined in the Bahamian liquidation proceeding. *See Treco II*, 239 B.R. at 44. Neither court decided whether BNY actually has a right of setoff and the parties have not addressed this question in their appellate briefs.

We disagree with the district court's conclusion. If BNY has a right of setoff, then its claim is deemed secured to the extent of the right of setoff. *See* 11 U.S.C. § 506(a); *In re Buckner*, 66 F.3d 263, 265 n. 3 (10th Cir.1995). And as we explained in part I of this opinion, the secured status of BNY's claim is critical to the propriety of turnover under § 304. Thus, in order to determine whether to grant turnover under § 304, the bankruptcy court—not the Bahamian court—has an obligation to determine whether BNY's claim is secured, which in turn may depend on whether BNY has a right of setoff.

Because turnover will be unavailable under § 304 if BNY has a right of setoff and its claim is therefore secured, we need not and do not reach the separate argument pressed by BNY and rejected by the bankruptcy court that the existence of a right of setoff preserved by § 553(a) provides an independent basis for barring turnover. *Cf.* 11 U.S.C. § 542(b) (providing that a creditor need not turn over property subject to setoff in a domestic bankruptcy); *Strumpf*, 516 U.S. at 20, 116 S.Ct. 286 (holding, in the context of a domestic bankruptcy proceeding, that a bank holding funds subject to a setoff was not required by 11 U.S.C. § 362(a)(7), which provides for an automatic stay of any setoff, to turn over those funds to the debtor, because such a requirement would "render § 553(a)'s general rule that the Bankruptcy Code does not affect the right of setoff meaningless, for by forcing the creditor to pay its debt immediately, it would divest the creditor of the very thing that supports the right of setoff"). We limit ourselves to the conclusion that upon remand, the district court should consider the existence of a right of setoff as part of its determination of whether BNY's claim is secured.

## C. Forum Selection Clause

Finally, BNY argues that turnover of funds to the Liquidators is barred by the forum selection clause contained in

the MIBL Pledge Agreement executed by MIBL as "Pledgor." This clause provides:

> **Law/Jurisdiction.** This agreement shall be construed in accordance with and governed by the laws of the State of New York. We [MIBL] submit to the jurisdiction of and agree that all proceedings relating hereto shall be brought in courts located within the City and State of New York or elsewhere as [BNY] may select.

The bankruptcy court did not address this argument. The district court, however, "f[ou]nd this argument meritless given (i) the limited scope of the MIBL Pledge Agreement, (ii) § 304's intent that claims related to bankruptcy proceedings be litigated in a single forum when the factors of § 304(c) support deference, and (iii) the established case law granting comity to foreign proceedings despite operative forum selection clauses." *Treco II*, 239 B.R. at 43 n. 9 (citing *Allstate Life Ins. Co. v. Linter Group Ltd.*, 994 F.2d 996, 1000 (2d Cir.1993) ("The presence of [forum selection] clauses . . . does not preclude a court from granting comity where it is otherwise warranted.")). We agree with the district court for substantially the reasons set forth in its opinion.

## CONCLUSION

For the foregoing reasons, we vacate the district court's judgment and remand for it to decide whether BNY possesses a secured claim and to conduct such other proceedings consistent with this opinion as it may deem necessary or advisable.