**In re Petition of the BOARD OF DIRECTORS OF COMPAÑÍA GENERAL DE COMBUSTIBLES S.A., et al., Debtors in Foreign Proceedings.**

**No. 00–B–16083 (BRL).**

United States Bankruptcy Court, S.D. New York.

Nov. 7, 2001.

Shearman & Sterling, by Jonathan L. Greenblatt, Lynette C. Kelly, New York City, for the Petitioners.

Weil, Gotshal, & Manges LLP, by Michael Kessler, of counsel, Lynda R. Vescio, of counsel Joshua Fried, of counsel, New York City, for Reef Exploration Inc.

Stroock & Stroock & Lavan LLP, by Brian M. Cogan, of counsel, Claude Szyfer, of counsel, New York City, for Hess Energy Trading, LLC.

White & Case, Esqs., by Daniel P. Ginsberg, New York City, for Petitioners.

### Supplemental Memorandum Decision Continuing Preliminary Injunction

BURTON R. LIFLAND, Bankruptcy Judge.

The Petitioners, the Boards of Directors of Sociedad Comercial del Plata, S.A. ("SCP") and Compañía General de Combustibles, S.A. ("CGC" and together with SCP, the "Debtors"), as the representatives of SCP and CGC in "Concursos Pre-

ventivos," or reorganization proceedings (the "CGC Concursos"), pending in the Federal Commercial Trial Court No. 15 in and for the City of Buenos Aires, Argentina (the "Argentine Court"), seek a continuation of the preliminary injunction granted by this Court's bench ruling on January 17, 2001. Reef Exploration, Inc. ("Reef") and Hess Energy Trading Company LLC ("Hess" and together with Reef, the "Objectors") object to the continuation of the injunction as to their claims. Hess also moves to vacate the injunction.

After a hearing on October 11, 2001 this Court found sufficient basis to continue the injunction and rendered a bench decision, (See Transcript of Hearing dated October 11, 2001 at 77, 80) but, in light of intervening case law issued subsequent to January 17, 2001, I instructed the parties that a supplemental decision addressing the legal arguments of the Objectors relating to the Second Circuit's recent decision in *The Bank of New York v. Treco (In re Treco)*, 240 F.3d 148 (2d Cir.2001) would follow.

### Background

SCP is a holding company organized under the laws of Argentina. Among other things, it owns CGC, an oil company, and Tren de la Costca ("TDC"), a transportation and entertainment company. On September 8, 2000, SCP, CGC, TDC and Solfina, S.A. ("Solfina")[1] filed voluntary petitions (the "CGC Concursos") for the commencement of Concurso Preventivos in the Federal Commercial Trial Court (the "Argentine Court") in Buenos Aires, Argentina. By order dated November 2, 2000, the Argentine Court granted the order for relief for all four debtors. *See In re: Reorganization Proceedings, Tren de la Costa S.A., Debtor,* Case No. 80980. The CGC Concursos is the largest reorganization proceeding in Argentine history.

---

1. Solfina is the parent company of SCP.

On December 28, 2000, the Petitioners commenced this ancillary case under Section 304 of title 11 of the United States Code (the "Bankruptcy Code") and moved this court for an order enjoining all persons from continuing or commencing any action against SCP or CGC or their property in the United States. The motion was opposed by several creditors including The Bank of New York[2], Reef and Hess.

Following the hearing on January 17, on February 1, 2001, this Court signed an order granting a preliminary injunction over the objections finding, *inter alia*, that the arguments set forth by CGC's creditors were premature and based on speculation as to what might transpire in the CGC Concursos. The injunction was without prejudice to any creditor's right to move to vacate the injunction and was to remain in effect pending a further hearing. The continuation hearing was originally scheduled for July 12, 2001, and subsequently adjourned by agreement of the parties until October 11, 2001.

**Concursos Preventivos**

A Concursos Preventivos under Argentine law is similar to a Chapter 11 reorganization. Upon the filing of a petition, an automatic statutory stay is in place which prohibits creditors from taking actions against the debtor or its assets or from pursuing claims against the debtor outside the reorganization proceedings. A creditors committee, made up of the debtor's largest unsecured creditors, is appointed. In the CGC Concursos, the bankruptcy

judge appointed a committee of creditors that includes foreign members, including The Bank of New York.[3] The judge also appointed three independent accounting firms to assist in the reorganization proceedings. One functions as a "Receiver," who monitors and supervises the finances of the businesses and two others, called Allowing Trustees or "Sindicos," handle claims administration and review the companies' claims. However, it is the judge in the Concurso who makes the final determination as to whether or not to recognize the claim. If objections are submitted to a particular claim, the claim can not be verified, but can be determined admissible (which could be for an amount different from the face amount of the claim) or inadmissible by the Argentine Court. Any party in interest is entitled to request an "incidente de revisión," or ancillary review proceeding ("Revisión") with respect to the Argentine Court's determination as to admissibility or inadmissibility of any claim within 20 business days after the ruling. The Revisión process requires an evidentiary hearing and affords a creditor whose claim has been ruled inadmissible an opportunity to prove its claim on the merits before the Argentine Court.

In the CGC Concursos, alleged creditors, including Reef and Hess, submitted proofs of claim to the Síndico for review as part of the claims verification process.[4] CGC filed objections to claims of certain creditors, including Reef and Hess. In addition, other creditors filed objections to

---

**2.** BNY has since withdrawn its objections.

**3.** The judge presiding over the CGC Concursos also ordered the Debtors to publish the opening of the Concurso for several days in the Wall Street Journal and has made the case docket available on the court's website so foreign creditors may follow the proceedings online.

**4.** In the CGC Concursos, the bar date for filing proofs of claim for verification by the Argentine Court was April 3, 2001. However, section 56 of the Argentine bankruptcy law allows late claims to be filed up to two years after the presentation of the petition of reorganization (in this case September 8, 2002).

the claims of Reef and Hess.[5] On August 13, 2001, the Argentine Court issued its ruling determining whether each claim was verified for purposes of voting and distribution.

The Argentine Court ruled that it could not admit Reef's claim without the presentation of evidence on the merits of its claim. The Argentine Court admitted a portion of Hess's claim but ruled that a disputed portion of the claim could not be determined absent an evidentiary hearing.

Both Reef and Hess have filed motions in the Argentine Court to commence Revisión proceedings. After their opportunities for full evidentiary hearings on the merits of their claims in the Argentine Court, if Reef and Hess are dissatisfied with the Argentine Court's decision, they will have recourse to appeals. During this process, Reef and Hess will retain all rights of creditors other than the ability to vote on a plan, including the right to object to the debtors' various filings and proposals, and, if their claims are ultimately admitted, to share on a *pari passu* basis with other unsecured creditors.

The Debtors filed their proposed categorization of the verified and declared admissible creditors on August 28, 2001. Upon approval of the categorization of creditors by the Argentine Court, which was expected by early November, the debtors will commence negotiations with their creditors regarding a proposed reorganization plan. The plan proposal must provide that each creditor in a particular category must receive the same treatment. Disputed creditors whose claims are later verified must receive the same treatment as similarly situated creditors. An "audience," or status conference, is scheduled before the Argentine Court for December 13, 2001, shortly before the scheduled termination on December 21, 2001, of the Debtors' exclusive period in which to present a plan of reorganization. As in large and complex chapter 11 cases in the United States, this exclusive period is often extended and the parties concede that is likely to occur in the CGC Concursos. Thus, the Argentine reorganization regime is a proceeding corresponding to our own in most significant respects.

**The Objectors' Claims**

### a. Reef

In May 1999, Reef presented an arbitration demand to CGC relating to certain stock transactions alleging, inter alia, violations of securities law, common law fraud, and breach of fiduciary duty. Although CGC appointed an arbitrator, CGC did not participate in the arbitration proceeding. Shortly after receiving the demand for arbitration, CGC commenced a proceeding in Argentina called an "Inhibitoria de Competencia" (the "Inhibitoria") on the grounds that the issues raised were not arbitrable and were properly within the jurisdiction of the Argentine courts. The Inhibitoria is an *ex parte* proceeding under Argentine law, the purpose of which is to resolve a jurisdictional dispute between the courts rather than between the parties. On September 23, 1999, the National Court of Appeals in Commercial Matters (the "National Court") in Argentina issued an order asserting that the Argentine courts had jurisdiction over the issues raised in the Reef Arbitration and asking the arbitration panel to refrain from hearing the case.

On June 27, 2000, the arbitral panel rendered a unanimous decision finding,

---

**5.** Notably, the roster of objecting creditors included United States creditors who are participating in the Argentine proceeding.

among other things, that CGC had defrauded Reef and awarding Reef $137.5 million in compensatory damages. In its award, the arbitral panel stated that, although it had been informed of the Inhibitoria in October 1999, it did not actually receive the communication from the National Court, dated October 5, 1999, until April 18, 2000, while the award was being drafted. The arbitral panel declined to abstain from ruling.

The arbitral award was reduced to judgment (the "Texas Judgment") by the United States District Court for the Northern District of Texas on September 28, 2000. CGC did not appeal the judgment. Reef filed a petition of Exequatur in Buenos Aires on November 3, 2000, seeking recognition of the Texas Judgment.

Reef sought verification of its claim based on the Texas Judgment in the CGC Concursos and submitted no other evidence for the Argentine Court to consider in determining the admissibility of its claim. CGC and several creditors objected to Reef's claim (*See* fn. 5 *supra*). The Argentine Court determined that Reef's claim was not admissible based on the evidence presented because Reef based its claim not on the merits but solely on a judgment as to which it had not obtained an Exequatur. As a result, the Argentine Court stated that it could not acknowledge a claim *"at this stage"* in favor of Reef.

Shortly thereafter, by order dated August 15, 2001, the Exequatur Court rejected Reef's petition seeking recognition of the Texas Judgment and ordered the Reef petition dismissed. Reef has appealed the dismissal and has commenced Revision proceedings in the Argentine Bankruptcy Court.

**b. Hess**

In September 1999, Hess and CGC entered into an agreement (the "Oil Swap Agreement") to engage in oil swap transactions. Pursuant to the Oil Swap Agreement, Hess was to pay CGC a fixed price per barrel of oil, and in return, CGC would pay Hess a floating price tied to certain futures contract prices. The agreement was to terminate in December 2000. However, the commencement of the CGC Concursos, which was purportedly an event of default under the Oil Swap Agreement, triggered the early termination of the swap transactions.

In its initial filing with the Argentine Court, CGC scheduled Hess as being owed $8,007,260, which according to Hess, fails to reflect an additional $9.1 million owed to them as a result of the early termination of the swap agreements. In March of 2001, Hess filed its proof of claim in the CGC Concursos for approximately $17.1 million. On August 13, 2001, the Argentine Court ordered that only the scheduled portion of Hess's claim would be allowed and the remaining $9.1 million would be disallowed. As noted above, Hess has commenced Revision proceedings with respect to the disallowed portion of its claim.

**Discussion**

Both Reef and Hess argue that the Second Circuit Court of Appeals decision in *Treco*, interpreting section 304(c), prohibits the continuation of the preliminary injunction. In particular, the parties assert that because they will not receive a distribution of proceeds of CGC's estate substantially in accordance with section 304(c)(4)of the United States Bankruptcy Code, this court should not extend comity to the foreign proceeding.

It is important to note at the outset that the *Treco* decision was based on an egregious set of facts involving what could be characterized as substantial maladministration by foreign liquidators of a foreign proceeding. In *Treco*, the liquidators of

the Meridien International Bank Limited ("MIBL"), a Bahamian company, filed an ancillary proceeding under section 304 of the Bankruptcy Code and sought to compel the turnover of collateral held by an allegedly secured creditor, Bank of New York ("BNY").[6] As MIBL's correspondent bank in the United States, BNY was in possession of approximately $600,000 remaining in MIBL's account at the time the section 304 petition was filed *Id.* at 152. MIBL sought turnover of those funds while BNY opposed the motion asserting it held the funds as security for two debts. *Id.* at 153. The bankruptcy court and the district court ordered the turnover and the Second Circuit reversed. *Id.* at 151.

The Second Circuit found that BNY's most forceful argument rested on section 304(c)(4), which directs the court to consider whether the "distribution of proceeds" of the debtors' estate in the foreign proceeding would be "substantially in accordance with the order prescribed by" the Bankruptcy Code. *Id. citing* 11 U.S.C. § 304(c)(4). The Court found that a key difference between the law in the Bahamas and the United states was that under Bahamian law a secured claim is subordinated to the administrative expenses of liquidation, while under the Bankruptcy Code, a secured creditor's collateral may be charged for administrative expenses only to the extent these expenses directly benefit such secured creditor. *Id.* at 155 *citing* 11 U.S.C. § 506(c); *In re Flagstaff Food-service Corp.*, 762 F.2d 10, 12 (2d Cir. 1985).

The significance of this distinction came to bear because of the shocking condition of the debtor's estate in the Bahamian proceeding. *See Treco*, 240 F.3d at 159 and

Jay L. Westbrook, *International Bankruptcy Approaches Chapter 15*, N.Y. Law Journal, Aug. 23, 2001, at 1, (col. 1) (hereinafter, "Westbrook"). The Court summarized the state of affairs in the Bahamian proceeding as follows:

> The Liquidators ... collected approximately $10 million in receivables, but only $1.75 million remained in the estate because nearly $8 million had been used to pay administrative expenses. Such expenses consisted of the Liquidators' fees—**at a premium rate fifty percent above their usual rates**—their staff's fees, their attorneys' fees, and travel and other expenses. What is more, these payments are apparently disbursed as a matter of bureaucratic routine "by the registrar" without notice to creditors, rather than pursuant to approval of a judge. Meanwhile, no money has yet been paid out to creditors.

*Id.* at 159 (emphasis added). Furthermore, despite the outrageously high administrative costs incurred at that point only 30 percent of the claims filed in the case had been processed. Thus, the Second Circuit was concerned that the Liquidators' fees and expenses were continuing to accumulate further administrative costs, while at the same time no estimation as to any distribution to creditors or the likely amount of such distribution was offered by the Liquidators. *Id.* Given these facts, the court concluded that "BNY would recover only a fraction, if any, of the $600,000 it holds as a secured creditor if it were ordered to turnover those funds." This outcome stood "in stark contrast to American law, which would diminish BNY's claim only by those administrative expenses that 'directly benefitted' BNY." *Id. citing Harvis Trien & Beck, P.C. v.*

**6.** For the purposes of its analysis, the Circuit assumed that BNY was a secured creditor but actually remanded the case to the district court for a determination as to whether BNY possessed a secured claim.

*Federal Home Loan Mortgage Corp. (In re Blackwood Assocs., L.P.),* 153 F.3d 61, 66 (2d Cir.1998). The Court therefore held, "that if BNY's claim is secured, turnover of these funds would be improper because of the extent to which the distribution of the proceeds of these funds in the Bahamian bankruptcy proceeding would not be 'substantially in accordance with the order prescribed by' the United States Bankruptcy Code." *Id. quoting* 11 U.S.C. § 304(c)(4).

▬▬ The holding of the *Treco* decision can be given three possible readings. *See* Westbrook *supra*, at 1, (col. 1). "The most extreme reading would be that the United States courts will not grant § 304 relief if any United States creditor, secured or unsecured, will do materially worse under foreign law." Westbrook, *supra*. The second reading would be to limit the holding to *secured* creditors such that a United States court would deny relief under a section 304 petition "as to any secured party that would receive a materially lesser amount in the foreign proceeding." *Id.* Lastly, and most reasonably, the *Treco* decision may be read as denying section 304 relief where there is clear evidence of maladministration or corruption. *Id.*

Reef and Hess posit that the first and most extreme reading of *Treco* is appropriate. As described below, they essentially take the position that they must be given identical treatment in the allowance of claims and distribution of proceeds of the estate in order for this court to find that the section 304(c)(4) requirement has been met. Although there are differences in

the laws of Argentina and the United States that *may*[7] effect the distribution that Reef and Hess ultimately receive, this alone cannot be grounds for a denial of the relief requested. This first extreme reading of *Treco* "would end cooperation in almost all cases, because the priority rules vary in detail among countries." Westbrook, *supra* at 1. Indeed, the *Treco* Court itself cautioned against such an approach:

> First, of course, we are not announcing a rule that whenever § 304(c)(4) is implicated, turnover or other relief should be denied. . . . We expect that a case-specific analysis required by § 304 will in many or most cases support the granting of the requested relief.

*Treco,* 240 F.3d at 161.

The second possible reading of the *Treco* decision, like the first, is an impractical approach and would give secured creditors a heightened status.[8] Moreover, neither Reef nor Hess are secured creditors.

The third and most reasonable approach is that *Treco* requires denial of section 304 relief where the court finds clear evidence of maladministration or corruption. This reading of *Treco* gives no comfort to the Objectors under an analysis of the facts of this case.

▬▬ Hess argues that because Argentine bankruptcy law does not provide special provisions for swap agreements as is found in section 560 of the Bankruptcy Code, its claim will not receive substantially similar treatment as required by section

7. There are appellate proceedings currently underway that may very well lead to Reef and Hess receiving full admission of their claims.

8. Section 304 gives no indication that secured creditors are exempt from its operation, and such a rule might either excuse secured parties from participating in a foreign bankrupt-

cy proceeding where it is inappropriate to do so and where such parties are absolutely needed for a successful reorganization, or fail to protect an unsecured creditor who is genuinely facing serious maladministration in the foreign proceeding. Westbrook, *supra*.

304(c)(4).[9] Section 560 preserves the right of a party to a swap agreement to terminate the agreement pursuant to a condition based on, *inter alia*, the filing of a bankruptcy petition by the debtor. These conditions, commonly known as ipso facto clauses, would otherwise be nullified by section 365(e) of the Bankruptcy Code. Argentine bankruptcy law does not have an analogous provision to section 560 regarding the swap agreement, and does not distinguish such agreements from other types of executory contracts. Under Argentine bankruptcy law, the debtor has a thirty-day period to decide whether to assume executory contacts before a creditor under such contract may exercise its contractual rights to terminate, and the incurrence of penalties by the debtor is prohibited during such time. It is therefore clear that with respect to the issue of termination provisions under swap agreements, there are differences between Argentine and United States bankruptcy law.

Section 304(c)(4) does not require that the foreign bankruptcy law provide *identical* treatment of a claim to that treatment provided under United States law in order to extend comity. *See In re Davis*, 191 B.R. 577, 587 (Bankr.S.D.N.Y.1996) ("In determining whether to grant comity to a foreign bankruptcy case, we need not find that the foreign law is identical to our own"); *In re Axona Intern. Credit & Commerce, Ltd.*, 88 B.R. 597, 610 (Bankr.

S.D.N.Y.1988) *aff'd.* 115 B.R. 442 (S.D.N.Y.1990). As stated, this extreme approach would effectively end cooperation among countries because special interest priority schemes vary greatly around the world.[10] *See* Westbrook *supra*, at 1, (col. 1).

Moreover, there is no basis for Hess's arguments that the provisions of our domestic Bankruptcy Code dealing with swap agreements must be imported into the bankruptcy laws of foreign jurisdictions and that the provisions of Argentine bankruptcy law providing for a 30-day period in which the debtor may assume swap agreements and prohibiting "penalties" as a result of the filing of a Concursos are fundamentally unfair. The policy underlying the swap transaction provisions of the Bankruptcy Code is not to protect the rights of United States creditors entering into swap transactions with foreign corporations, but rather those of creditors (including foreign creditors) of United States counterparties that may be subject to the United States bankruptcy laws. Congress saw the need to ensure the ability of United States corporations to take advantage of the swap market by reducing the uncertainty about the potential impact of a bankruptcy filing in the United States of a U.S. party to such a swap agreement. *See* 136 Cong. Rec. H 2282 (May 15, 1990) (statements of Reps. Brooks and Schumer); 136 Cong Rec. S 7535 (daily ed. June

---

**9.** Section 560 of the Bankruptcy Code states in pertinent part: "The exercise of any contractual right of any swap participant to cause the termination of a swap agreement because of a condition of the kind specified in section 365(e)(1) of this title or to offset or net out any termination values or payment amounts arising under or in connection with any swap agreement shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by order of a court or administrative agency in any proceeding under this title." 11 U.S.C. § 560.

**10.** For example the Bankruptcy Code contains discrete special interest legislation granting priority to certain unsecured claims, such as claims of grain elevator operators and fishermen. *See* 11 U.S.C. § 507(a)(5). Congress clearly did not contemplate the denial of relief under section 304(c) of the Bankruptcy Code on the basis that a foreign insolvency law failed to provide the same priority for a grain elevator operator's claim as does the United States Bankruptcy Code.

6, 1990) (statement of Sen. DeConcini). This certainty, in turn, was expected to "help American businesses compete effectively in [the swap market]." *Id.* Congress was not seeking to protect a fundamental right of swap participants, but was seeking to ensure access to the swap market for United States borrowers and stabilize United States domestic markets. *See* 136 Cong. Rec. H 2282 (May 15, 1990) (statement of Rep. Schumer); 136 Cong Rec. S 7535 (daily ed. June 6, 1990) (statement of Sen. DeConcini); *Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Savings Ass'n, (In re Thrifty Oil Co.),* 249 B.R. 537, 547 (S.D.Cal.2000), *citing* 136 Cong Rec. S 7535 (daily ed. June 6, 1990) (statement of Sen. DeConcini).

Argentine bankruptcy law provides a debtor thirty days following the granting of an order for relief to request authorization from the bankruptcy court to continue an executory contract. *See* Reply Dec of Dr. Jorge Osvaldo Lopez at ¶ 24 (Oct. 4, 2001). After such time the creditor may exercise its rights under the contract if a decision to continue has not been communicated by the debtor. *Argentine Law of Insolvency Proceedings and Bankruptcy,* No. 24,522, Article 20 (as translated by Latin American Linguistic Service). Under the Bankruptcy Code, absent a specific provision, a debtor has until confirmation of a plan, and in some cases beyond to either assume or reject an executory contract. *See generally* 11 U.S.C. §§ 365, 1123(b)(2); *see also In re Klein Sleep Products, Inc.,* 78 F.3d 18, 29 (2d Cir. 1996). During such time a creditor is ordinarily barred by the automatic stay from terminating the contract. *See* 11 U.S.C. § 362(a). Therefore, Argentine bankruptcy law actually provides greater protection to the non-debtor party to an executory contract, because such party is not forced to continue to perform and instead may act on their contractual rights, in the absence of an assumption by the debtor, after thirty days. Certainly, the Argentine law provides sufficient procedural safeguards so that the foreign proceedings are not "repugnant to American laws and policies." *In re Davis,* 191 B.R. at 587, *citing In re Brierley,* 145 B.R. 151, 166 (Bankr. S.D.N.Y.1992).

Turning to Reef's next argument, Reef claims that it is being prejudiced because it has a final judgment against CGC from the United States District Court for the District of Texas that would presumably be given full faith and credit by a United States bankruptcy court but is not being recognized by the Argentine Courts. Consequently, Reef argues it is not being treated to a potential distribution of CGC's estate substantially in accordance with the way the estate would be distributed under the Bankruptcy Code. *See* 11 U.S.C. 304(c)(4).

As noted the Texas Judgment was obtained while the Inhibitoria was in effect. Although Reef's judgment may still be entitled to recognition in Argentina regardless of the existence of the Inhibitoria, that issue is one for the Argentine Court to decide. *See Victrix Steamship Co., S.A. v. Salen Dry Cargo A.B.* 825 F.2d 709, 715 (2d Cir.1987) (holding that the Swedish bankruptcy court, where the insolvency proceeding was pending, was the proper forum to determine what benefit, if any, a creditor should enjoy from having obtained an arbitration award and judgment in Britain). In fact, Reef is continuing to prosecute its claims there.

Reef cites no authority for its argument that a foreign bankruptcy court must allow a claim based solely on a default judgment obtained in disregard of an existing order of an appellate court in that foreign jurisdiction in order for the foreign bankruptcy scheme to be fundamentally fair.

Reef has the same opportunity as any other creditor to present full evidence of its claim and to prove that claim to the Argentine Court on the merits and as part of that evidence, present its as yet unrecognized United States judgment and arbitration award. In addition, Reef may also continue to pursue its appeal of the Exequatur ruling in an effort to obtain recognition of the Texas Judgment for purpose of proving its claim.

In sum, applying a case specific analysis, the Objectors' positions are completely distinguishable from the position of the creditor in *Treco*. Neither Objector is a secured creditor, nor is holding any assets of CGC. The Objectors' potential recoveries, should their claims ultimately be allowed in whole or in part in the CGC Concursos, will not be subjected to an unfair distribution priority but will be treated in the same manner as those of CGC's other general unsecured creditors. Nothing under Argentine bankruptcy law subordinates Reef's or Hess's claim to a level below that of other similarly situated creditors. The claims of all unsecured creditors, including those whose claims are initially disputed and later verified, will be afforded equal treatment and will receive an equal distribution under Argentine law. Both Objectors are active participants in the Argentine proceeding.

Most importantly, as set forth above, the facts in this case, as to either Objector, are clearly distinguishable from the situation in *Treco*. Here there are no indications of maladministration and waste in the CGC Concursos. The record gives every indication that the CGC Concursos have been conducted fairly with respect to the Objectors.

## CONCLUSION

Accordingly for the reasons set forth above and on the record of the hearing dated October 11, 2001, I find that the

holding of the Second Circuit in *Treco* does not require that the injunctive relief granted be dissolved as to the Objectors. Therefore, the preliminary injunction is continued through the conclusion of the next hearing scheduled for March 15, 2002.