**In re Petition of Delia Josefina Flores CALDAS and José Carlos Torres Chávez, Representatives of NBK Bank, Debtors in a Foreign Proceeding.**

No. 01–16006(REG).

United States Bankruptcy Court, S.D. New York.

Feb. 22, 2002.

---

White & Case, by John S. Willems and James T. Cain, New York City, for Debtor.

Curtis Mallet–Prevost, Colt & Mosle, by T. Barry Kingham and Theresa Foudy, New York City, for Tribank International Bank, Ltd.

## DECISION ON MOTION FOR PRELIMINARY INJUNCTION

ROBERT E. GERBER, Bankruptcy Judge.

In this proceeding under section 304 of the Bankruptcy Code,[1] the petitioners Delia Josefina Flores Caldas and José Carlos Torres Chávez, the representatives appointed by the Superintendency of Banking and Insurance of Peru (the "Petitioners," or "NBK Representatives") of NBK Bank ("NBK"), a Peruvian bank, move for

a preliminary injunction under Bankruptcy Code sections 304 and 105(a)[2] blocking, *inter alia,* the prosecution of a plenary lawsuit now pending in the Supreme Court of the State of New York between Tribank International, Ltd. ("Tribank"), as plaintiff, and NBK as defendant. Tribank opposes the motion, contending that the NBK Representatives have satisfied neither the requirements for a preliminary injunction, under Fed.R.Civ.P. 65(a), nor the requirements, under applicable law, for relief under section 304.

The motion was notably well briefed and argued. The Petitioners' motion is granted in part and denied in part; relief will be granted to avoid the piecemeal dismembering of NBK assets in the United States and to prohibit any other actions against NBK or its property in the United States (at least without first obtaining leave from this Court), but the Court will permit Tribank to liquidate its claims in the United States for further processing in Peru. The following represents the Court's findings of fact, conclusions of law, and bases for the exercise of its discretion in connection with the motion.

### Facts

The relevant facts (which include proof of foreign law, which has been offered by declaration), insofar as relevant to this motion (and thus which do not include, for example, details with respect to the merits of the litigation that is sought to be en-

---

1. The Court has jurisdiction over this case and proceeding under 28 U.S.C. § 1334, in that it is a case under title 11, and that the claims in the proceeding arise under title 11. The Court has the jurisdiction to issue final orders in this proceeding under the "Standing Order of Referral of Cases to Bankruptcy Judges," dated July 10, 1984 (Ward, Acting C.J.). This is a core proceeding under, *inter alia,* 28 U.S.C. § 157(b)(2)(A). Venue in this

district is proper pursuant to 28 U.S.C. § 1410(a).

2. Section 304 is quoted, in relevant part, at page 13 below. Section 105(a) provides, in relevant part, that:

The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.

joined, other than as defining its issues and its requested relief) are not in dispute.

Under Peruvian law, the Superintendency of Banking and Insurance (the "Superintendency") is responsible for overseeing the financial affairs of Peruvian banks. On December 11, 2000, the Superintendency intervened in the operation of NBK as a result of NBK's failure to make payment on its obligations. Under the *Intervención* (the "Intervention Regime"), the Superintendency appointed Petitioners as Representatives of the Superintendency to conduct the *Intervención* and ordered the immediate suspension of NBK's activities. The Superintendency is the administrative agency under the Peruvian Constitution that represents the Government of Peru in banking and insurance matters and enforces the Government's policies in those areas. Under the Peruvian Banking Act, the Superintendency is charged with administering the reorganization and liquidation of troubled Peruvian banking institutions. Because it is a public agency, the Superintendency's decisions may be reviewed by the Peruvian courts.[3]

*The Peruvian Proceeding*

On April 24, 2001, by Resolution SBS No. 306–2001 (the "April 24 Resolution"), the Superintendency placed NBK under the purview of the *Régimen Especial Transitorio* (the Special Transitory Regime, or "Regime"). The Regime was enacted by Emergency Decree No. 044–2001 on April 12, 2001, in the framework of the Program for the Consolidation of the Financial System (the "Program"), created on November 27, 2000 by Emergency Decree No. 108–2000. The Regime parallels the regular insolvency process outlined

above, and the duties, powers, and responsibilities of the Superintendency are the same as those under the Peruvian Banking Act generally.[4] The purpose of the Program is the strengthening of the Peruvian financial system and the limiting of risks historically associated with bank reorganizations and liquidations, by facilitating the reorganization or merger of troubled banking institutions, such as NBK.[5]

The April 24 Resolution appointed Petitioners as Representatives of the Superintendency for NBK for the duration of the Regime.[6] Under the Peruvian proceeding, a portion of NBK's assets and obligations will be sold to a solvent Peruvian financial institution, and the remaining assets will be transferred into two trusts in accordance with Peruvian law. The first trust will be comprised of "fully provisioned assets" and will issue backed certificates to the Ministry of Finance, the Deposit Insurance Fund, and NBK shareholders. The remaining assets, which will not be sold to the purchaser institution, will be placed into a second trust, and will pay any contingent liabilities of NBK. Finally, NBK will be dissolved and liquidated. Expenses resulting from the *Disolución y Liquidación* will be paid out of the second trust.[7]

The Peruvian Constitution guarantees equal treatment under the law of all persons subject to jurisdiction in Peru, regardless of their nationality, and thus all of NBK's creditors of a given class, be they Peruvian or not, enjoy the same rights under the Peruvian Banking Act.[8]

*Scope of the April 24 Resolution*

While the matter has now been clarified, the coverage of the April 24 Resolution

3. Rocca Decl. ¶ 3.

4. Rocca Decl. ¶¶ 10, 11.

5. *Id.* at ¶ 11.

6. *Id.* at ¶ 12.

7. *Id.* at ¶ 13.

8. *Id.* at ¶ 19.

was for a time a matter of dispute. In a statement that has now been conceded to be overly broad, the NBK Representatives asserted in their papers, as backed up by a declaration of their Peruvian law expert Lilian Rocca ("Rocca Decl."), that under the Regime put in place under the April 24 Resolution, as in *Intervención*, creditors are barred from initiating lawsuits; from collecting judgments; and from attaching bank property.[9]

By contrast, however, Tribank's Peruvian law expert Dr. Emilio Rodríguez Larraín Salinas stated in his declaration ("Rodríguez Decl.") that the April 24 Resolution does not prohibit *all* litigation or actions against NBK, but only certain kinds. As relevant here, he opined that under the April 24 Resolution, creditors are prohibited from commencing (and, impliedly, continuing) judicial or administrative proceedings "to collect credit balances entrusted to it, or to execute prescribed judicial resolutions."[10] He noted that the New York Action is intended to determine the civil liability of NBK Bank; that is, to have Tribank's claims determined in a judgment issued by the court, stating that it is not an action to collect upon a recognized claim or debt, but to establish the liability of NBK Bank.[11] As such, he stated, it is not a claim that is prohibited from being brought outside of a Peruvian proceeding to liquidate or reorganize a bank, because such proceedings only recognize liquidated, established, or undisputed claims.[12]

Dr. Rodríguez further stated that Peruvian liquidations or bankruptcies administer only the payment of liquidated or undisputed claims, and do not adjudicate the validity of disputed claims. He stated that a claimant with an unliquidated claim, such as Tribank's, must first have a court render a judgment in its favor and then bring that judgment to the liquidators to be administered in the liquidation or bankruptcy. Accordingly, he concluded, an unliquidated and disputed claim, such as Tribank's, does not fall within the prohibition on suits in the April 24 Resolution.[13]

When they submitted their reply papers, the NBK Representatives did not submit a reply declaration or affidavit disputing Dr. Rodríguez' statements as to Peruvian law, including, perhaps most significantly, Dr. Rodríguez' assertions that (1) there was lacking a mechanism in the *Disolución y Liquidación* or under the Regime for the allowance of unliquidated claims; and that (2) there was no prohibition, under the Regime or other applicable Peruvian law, against the liquidation of such claims elsewhere. The NBK Representatives' response in this regard was in substance limited to rhetorical flourishes and assertions that these points were irrelevant.[14] Under these circumstances, the Court finds there to be no material issue of dis-

---

9. *Id.* at ¶ 6 (under *Disolución y Liquidación*); Rocca Decl. ¶ 5 (under *Intervención*).

10. Rodríguez Decl. ¶¶ 4, 5.

11. *Id.* at ¶ 6. The Court was concerned, until the conclusion of oral argument on the motion, that such was only one of its purposes, and that another was to execute on assets in New York as a consequence of the judgment—which plainly was suggested by Tribank's efforts to secure a prejudgment attachment. At the oral argument, counsel for Tribank disclaimed such an intent, and

agreed that if permitted to proceed, it would not seek, in New York, anything other than a judgment fixing its claim in amount. The Court considers this undertaking sufficiently important that limitations in this regard would be embodied in any order on the motion that this Court might enter.

12. *Id.* at ¶ 6.

13. *Id.* at ¶ 7.

14. *See* Petitioners' Reply Br. ¶¶ 11, 13.

puted fact with respect to the accuracy of Dr. Rodríguez' statements as to the Peruvian law, and it finds them as facts accordingly.

Finally, the Court notes that at oral argument counsel for the NBK Representatives acknowledged that the statement in the Rocca Declaration that "[i]f Tribank had brought those claims in a Peruvian court, they would be stayed in view of ongoing liquidation of NBK under the Regime" [15] was incorrect—suggesting, though without further support in the record,[16] that the courts of Peru (though not the Superintendency in the Peruvian *Disolución y Liquidación* proceeding) could and would hear such claims, so those claims could be liquidated there. Ironically, in support of their contention that Peruvian courts could and would hear such claims, counsel for the Petitioners relied on the Rodríguez Declaration, which said the Peruvian courts were *not stayed* from doing so, but which did not say they *would* hear such claims. The Court finds, as a fact, that the Peruvian courts would not be prohibited under the Regime or other applicable Peruvian law from hearing such claims, but cannot make a finding that they would hear them. With respect to the latter issue, for lack of proof, the Court is not in a position to make a finding either way.

*Purpose of the Peruvian Regime*

Under a catch-line that the purpose of the Peruvian Regime here is "Selling the Bank," rather than "Equitably Distributing NBK Bank's Assets To Its Creditors," [17] Dr. Rodríguez further expresses the view that the Peruvian Regime has purposes other than, and inconsistent with, a bankruptcy case as it would be thought of in the United States. By the April 24 Resolution, he states, the Superintendency placed NBK Bank into the Special Transitory Regime created by Emergency Decree No. 108–2000, which in turn created the "Financial System Consolidation Program" *(Programa de Consolidación del Sistema Financiero)*. The purpose of that decree, he states, was "to promote the corporate reorganization of companies engaged in multiple operations in the national financial system," in order to encourage "the strengthening of the financial system," [18]

By a resolution in December 2000, the Peruvian Ministry of Economy and Finance set forth "Operational Regulations of the Financial System Consolidation Program," which provided a governing procedure to follow in an extrajudicial selling of one bank, or an equity block of one bank, to another bank. Notably, he states, the regulations do not require the approval of a court or of the creditors before the bank or an equity block of the bank is sold, but rather give the Superintendency complete discretion to decide what assets and liabilities will be made part of the split equity and which assets and liabilities shall go into residual trusts.[19]

Dr. Rodríguez further states that by contrast to the procedure under Emergency Decree No. 108–2000 (the procedure that was and will be implemented here), banks normally are liquidated in Peru ac-

---

15. Rocca Decl. ¶ 18.

16. The Court notes that counsel for Petitioners was very careful, in responding to questions by the Court, to note when he was responding with observations that lacked support in the record, and the Court finds no fault in that regard.

17. Rodríguez Decl. catch-line preceding ¶ 8.

18. Rodríguez Decl. ¶¶ 8–9.

19. *Id.* at ¶ 10.

cording to Peruvian Legislative Decree number 637. Under that law, the goal of the liquidation is the fair and orderly distribution of a bank's assets to its creditors, and there are procedural safeguards in place to ensure that this goal is met.[20] Emergency Decree No. 108–2000 and its implementing regulations, Dr. Rodríguez observes, changed that law in the interests of meeting an economic crisis.[21]

The goal of Emergency Decree No. 108–2000 is not the fair and orderly distribution of a bank's assets to its creditors, but rather "to promote the corporate reorganization of companies engaged in multiple operations in the national financial system" in order to encourage "the strengthening of the financial system." To meet those goals, he states, the Superintendency is more concerned with merging an insolvent bank into a solvent bank than it is with treating creditors fairly. He states that there is absolute discretion invested in the Superintendency to decide which assets and liabilities will be transferred to a solvent bank, and which assets and liabilities will go into a trust in which the assets are not sufficient to pay the liabilities. Therefore, he states, the system does not provide for the fair treatment of creditors.[22]

*The Tribank New York Action*

Without dispute, Tribank is a Cayman Islands bank with offices located in Peru that did business in Peru. Tribank is not licensed to do business in the United States, and has no significant contacts with the United States.

On October 25, 2001, Tribank commenced an action for conversion and un-just enrichment against NBK in the Supreme Court of the State of New York, County of New York, entitled *Tribank International Bank, Ltd. v. NBK Bank* (Index No. 01/119987) (the "Tribank New York Action"). Tribank seeks to recover approximately $8.4 million that certain directors and shareholders of NBK allegedly diverted from Tribank to NBK, allegedly by using what is said to be a New York company, Westfalia Investments, S.A., to conduct an alleged sham sale of Peruvian sovereign bonds ("PDIs") for NBK's benefit. Tribank alleges that it never received the bonds for which it paid more than $8.4 million in cash that NBK received from Westfalia.[23]

While Tribank does not allege that it entered into a contract with NBK or that it sent any funds directly to NBK,[24] Tribank contends, in substance, that when it allegedly paid the approximately $8.4 million for the bonds; when that money allegedly went through the New York company Westfalia to NBK; and when NBK never provided the bonds, NBK is liable for the conversion of that $8.4 million, or alternatively, for unjust enrichment.[25]

On October 25, 2001, Hon. Richard B. Lowe, sitting in the Tribank New York Action, issued an ex parte temporary restraining order in the Tribank New York Action, enjoining Citibank N.A. from transferring funds NBK has on account with that institution. Following a hearing on November 19, 2001 on Tribank's application for a writ of attachment, Justice Lowe continued the temporary restraint

---

**20.** *Id.* at ¶ 11.

**21.** *Id.* at ¶ 12.

**22.** *Id.* at ¶¶ 9, 12.

**23.** Tribank Response ¶¶ 1, 10. Tribank may have instead received an alternative invest-

ment, a derivative investment called a "Total Return Default Swap," but it is said to have been "comparatively worthless." *Id.* at ¶ 11.

**24.** NBK Motion ¶ 9.

**25.** Tribank Response ¶¶ 1, 5, 7, 9, 10.

against Citibank N.A. in anticipation of NBK's Section 304 petition,[26] which was filed in this Court on November 29, 2001.

### Contentions

The NBK Representatives argue that to achieve success in the Peruvian proceeding, and in particular, the "speedy and orderly resolution of claims against NBK,"[27] they must be able to protect the assets of NBK from Tribank and other creditors, wherever they may be situated. This, they argue, will enable the NBK Representatives to maximize the amount to be distributed to NBK's creditors worldwide in conformity with the Peruvian proceeding. The goals of the Peruvian legislation, they argue, would be seriously undermined if Tribank were permitted to proceed with actions against NBK or its assets in the United States, thereby obtaining a preference over other creditors, and they argue that the injunctive relief they seek will prevent the piecemeal distribution of NBK's assets.[28]

Tribank argues, by contrast, that because the Peruvian reorganization proceeding and its accompanying stay of litigation concern only liquidated debts, and do not recognize unliquidated claims, such as the tort claims raised in the Tribank New York Action, the Peruvian proceedings do not preclude lawsuits to determine liability for such disputed claims. Thus, Tribank argues, neither comity nor Section 304 compels the issuance of an injunction against the New York Action.[29]

Each of their arguments, however, must be reexamined in substantial part by reason of the clarification at oral argument with respect to two matters that had been of concern to the Court:

(1) Tribank has now stated that though it once tried to realize upon assets in the United States, it no longer seeks to do so;[30] and

(2) it now is agreed that Peruvian law does not prohibit Tribank's liquidation of any claims it might have.

Thus it no longer appears, as the Court had once feared, that Tribank wishes to "grab" assets, or that the Court has to evaluate the rights of Tribank to assert its claims against any Peruvian policy that Tribank's claims could not be heard. The Court nevertheless has to consider whether the costs and burdens on the NBK Representatives of defense of Tribank's claims in the United States warrant an injunction which, based on the record presented, could have the effect of making it difficult or impossible for Tribank to liquidate its claims.

### Discussion

By their motion, the Petitioners seek an order of this Court to preliminarily enjoin: (i) Tribank from continuing the Tribank New York Action; and (ii) anyone else from commencing any action against NBK or NBK's assets. As the Court understands the former request, the NBK Representatives wish to enjoin Tribank not only from seizing or otherwise achieving a priority over NBK creditors with respect

---

26. *Id.* at ¶ 17.

27. NBK Motion ¶ 14.

28. *Id.* at ¶ 15.

29. Tribank Response ¶ 3, 4.

30. Plainly Tribank's efforts to secure an attachment in the New York Supreme Court

had the effect, if not also the purpose, of recovering on assets to the exclusion of other creditors, and/or with a priority over them, and the NBK Representatives' concerns in this regard were hardly paranoid or unfounded; nevertheless, given Tribank's undertaking, this is no longer a matter of concern.

to assets in the United States or elsewhere—a goal which Tribank, after the briefing on the motion, now has disclaimed—but also to enjoin Tribank from liquidating its claims in the Tribank New York Action.

## I.

Under Section 304(a) of the Bankruptcy Code, a case in the United States ancillary to a foreign proceeding may be commenced by the filing with the bankruptcy court of a petition under section 304 by a foreign representative. Section 304(b) then goes on to provide:

> (b) Subject to the provisions of subsection (c) of this section, if a party in interest does not timely controvert the petition, or after trial, the court may—
>
> (1) enjoin the commencement or continuation of—
>
> (A) any action against—
>
> (i) a debtor with respect to property involved in such foreign proceeding; or
>
> (ii) such property; or
>
> (B) the enforcement of any judgment against the debtor with respect to such property, or any act or the commencement or continuation of any judicial proceeding to create or enforce a lien against the property of such estate;
>
> (2) order turnover of the property of such estate, or the proceeds of such property, to such foreign representative; or
>
> (3) order other appropriate relief.

■ Section 304 of the Bankruptcy Code, enacted as part of the Bankruptcy Reform Act of 1978, "was intended to deal with the complex and increasingly important problems involving the legal effect the United States courts will give to foreign bankruptcy proceedings." *The Bank of New York v. Treco (In re Treco)*, 240 F.3d 148, 153 (2d Cir.2001) ("*Treco*"), *quoting Cunard S.S. Co. v. Salen Reefer Servs., AB*, 773 F.2d 452, 454 (2d Cir.1985) ("*Cunard*"). Section 304 was designed to assist foreign representatives in administering the debtor's United States assets. *See In re MMG LLC*, 256 B.R. 544, 549 (Bankr. S.D.N.Y.2000) ("*MMG*") (Bernstein, C.J.) (*citing* Second Circuit cases). In applying its principles, courts acknowledge that the foreign court presiding over the original proceeding is in the better position to decide when and where claims should be resolved in a manner calculated to conserve resources and maximize assets. *Id.* at 549. Section 304 allows the foreign representative to prevent creditors from grabbing local assets, and expedite the orderly and equitable distribution of the foreign estate. *Id.*

■ But as Judge Bernstein noted in *MMG*, a section 304 proceeding is not a full blown bankruptcy, and the most important distinction, as relevant in *MMG* and here, is that the filing does not trigger an automatic stay. *Id.* As a result, the foreign representative generally seeks an immediate injunction in the nature of a stay on the day he or she files the ancillary petition, *id.* as the foreign representatives did in *MMG* and here.

In connection with that, section 304(c) sets forth standards for the court to take into account in granting or denying relief under section 304(b). Section 304(c) provides:

> (c) In determining whether to grant relief under subsection (b) of this section, the court shall be guided by what will best assure an economical and expeditious administration of such estate, consistent with—

(1) just treatment of all holders of claims against or interests in such estate;

(2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;

(3) prevention of preferential or fraudulent dispositions of property of such estate;

(4) distribution of proceeds of such estate substantially in accordance with the order prescribed by this title;

(5) comity; and

(6) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.[31]

■ Thus it is clear that a bankruptcy court has the power, under section 304(b)(1)(A), to preliminarily enjoin an action of the character of the Tribank New York Action, assuming that (1) issuance of such an injunction, under the facts presented in the particular case, is consistent with the standards for the exercise of the section 304(b) power under section 304(c) and the applicable caselaw, and that (2) the circumstances otherwise meet the requirements for entry of a preliminary injunction.[32]

■ As a practical matter, however, those requirements overlap, as elements of the standards for issuance of a preliminary injunction—particularly those going to the likelihood of success and serious issues for further litigation—require consideration of issues going to the merits. For that reason, the Court considers section 304 doctrine first.

## II.

In explaining their need for section 304 relief, the NBK Representatives made

---

**31.** In connection with this, the Second Circuit has noted that section 304(c) "requires the courts to conduct a case-by-case balancing of the statutory factors." *Treco*, 240 F.3d at 154. It has noted legislative history confirming that section 304's guidelines "are designed to give the court the maximum flexibility in handling ancillary cases," *id.*, with the court making "the appropriate orders under all of the circumstances of each case, rather than being provided with inflexible rules." *Id.*

The Second Circuit went on to note in *Treco* that "§ 304 by its terms requires an exercise of judicial discretion." *Id.* at 154–155, *citing Koreag, Controle et Revision S.A. v. Refco F/X Assocs., Inc. (In re Koreag, Controle et Revision, S.A.),* 961 F.2d 341, 359 (2d Cir.), *cert. denied,* 506 U.S. 865, 113 S.Ct. 188, 121 L.Ed.2d 132 (1992); *Cunard,* 773 F.2d at 459–460; *A.P. Esteve Sales, Inc. v. Manning (In re Manning),* 236 B.R. 14, 19 (9th Cir. BAP 1999); *Vesta Fire Ins. Corp. v. New Cap Reinsurance Corp.,* 244 B.R. 209, 212 (S.D.N.Y.2000) (Sweet, D.J.).

**32.** In *MMG*, Judge Bernstein observed that there, as in most cases, the request for a preliminary injunction had come before section 304(b)—which would authorize the final relief to be granted—was triggered. *See* 256 B.R. at 551–552. Thus, Judge Bernstein determined that it was appropriate for the bankruptcy court to exercise its inherent authority under section 105(a) to maintain the status quo pending its determination of the ancillary case, and he concluded that as the court was relying upon its inherent power, rather than section 304(b), the traditional standards for preliminary injunctive relief would be considered. *Id.* at 552. In making that determination, the section 304(c) factors had to be considered under the second prong of a classic preliminary injunction analysis, but would not alone determine whether relief should be granted. *Id.* at 552.

Particularly since, as Judge Bernstein also noted, section 304(b) does not distinguish between "preliminary" and "final" injunctive relief, *id.* at 551 n. 7, and the parties here have not contended that it would make a difference under the facts of this case, this Court has analyzed the issues with the same preliminary injunction analysis that Judge Bernstein employed, without the need to focus on whether resort to section 105(a) is mandatory or optional.

many strong points in their papers. However, most were mooted, with respect to the portion of the motion that focuses on Tribank, by the post-briefing undertaking on the part of Tribank that it will not grab assets. Discussion of the issues with respect to the remaining issues to be decided follows.

### A.

 As noted above, the decision whether to grant relief under Section 304 "calls for a case-specific exercise of discretion in light of all of the circumstances." *Treco*, 240 F.3d 148, 156 (2d Cir.2001); *see also In re Rubin*, 160 B.R. 269, 274 (Bankr.S.D.N.Y.1993) ("*Rubin*") (Brozman, C.J.). Under the totality of the circumstances of a particular case, one factor may nevertheless dominate, as it did in *Treco*, where the subordination of secured claims to administrative expenses under Bahamian law resulted in a conclusion that the distribution of proceeds was not "substantially in accordance with the order" of the Bankruptcy Code, *see* section 304(c)(4), and thus that granting relief under section 304 in that proceeding was an abuse of discretion. *See Treco*, 240 F.3d at 159–161.

Insofar as relevant here,[33] Bankruptcy Code section 304(c), quoted above, sets forth five relevant factors this Court must consider. Shifting around the order to facilitate discussion, the Court considers them to bear on the NBK Representatives' likelihood of success in the following manner.

*Comity—Section 304(c)(5)*

 Just as they do in the non-bankruptcy context, courts and commentators addressing comity in the context of section 304 frequently refer to the decision of the United States Supreme Court, over a hundred years ago, in *Hilton v. Guyot*, 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95 (1895). The Court there explained that:

> "Comity" in the legal sense, is neither a matter of absolute obligation on the one hand, nor of mere courtesy and good will on the other. But it is recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.

*Id.* at 163–164, 16 S.Ct. 139. *See also* 2 Lawrence P. King et al., *Collier on Bankruptcy* (15th ed. rev.2000) ("*Collier*") ¶ 304.08[5][a].

 *Collier* notes that the legislative history of section 304(c) indicates that Congress included comity in that section so that the legitimate interests of a foreign proceeding would be given due consideration. *See Collier* ¶ 304.08[5][b]. The Second Circuit stated in *Treco*, with respect to comity:

> We do not quarrel with the view of the Liquidators [of the Bahamas proceeding there involved], shared by many courts, that comity is the ultimate consideration in determining whether to provide relief under § 304. The purpose of the section is to provide a statutory mechanism through which United States courts may defer to and facilitate foreign insolvency proceedings.

240 F.3d at 156 (footnote omitted). However, comity "has never meant categorical deference to foreign proceedings," *id.* at 157, and does not automatically override the other specified factors. *Id.* at 156.

---

**33.** Understandably, the litigants do not discuss factor # 6 ("the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns"), and the Court shares their view that it is not applicable here.

"Rather, a court's function under § 304 is to determine whether comity should be extended to the foreign proceeding in light of the other factors." *Id.*[34]

Here comity can be granted without running afoul of the other factors. There has been no showing that proceedings in Peru fail to comport with United States notions of due process, and plainly granting injunctive relief will serve principles of comity. Also important in considering comity, in this Court's view, is a variant of that—whether this Court, by its action or inaction, would be permitting something to happen here when it is *prohibited* in Peru. Because the factual record has now been clarified to confirm that there is no prohibition under Peruvian law against having a claimant's claim liquidated in another forum, any concerns as to comity for Peruvian law in this regard are inapplicable here; there is no need, in the interests of comity, to prohibit the continuation of a U.S. proceeding which merely is for the liquidation of a claim when Peru would not provide a vehicle for liquidation of claims in its own insolvency proceeding, and would not prohibit such liquidation elsewhere.

In short, interests of comity warrant relief for the Petitioners generally, but do not foreclose a carve-out to permit liquidation of claims within the United States for the purpose of bringing the results back to the Peruvian *Disolución y Liquidación.*

*Just Treatment of All Holders of Claims— Section 304(c)(1)*

It is undisputed that under the law of Peru, the claims of non-Peruvians are treated no differently than those of similarly-situated Peruvians, so this is not a matter of concern. Given this, at least in the absence of other circumstances, there is nothing offensive in requiring claimants from the United States, or from the Cayman Islands, to participate in proceedings in Peru in order to share in the recoveries to which they are otherwise entitled under Peruvian law.

However, the undisputed fact that a Peruvian bank liquidation does not adjudicate the validity of disputed claims—and thus that a claimant with an unliquidated claim, such as Tribank's, must first obtain a court judgment in its favor and then bring that judgment to the NBK Representatives to be administered in the Peruvian *Disolución y Liquidación*—is relevant here. In this Court's view, basic principles of fairness require that this Court be slow in denying Tribank the opportunity to liquidate its claims in New York—for further processing in Peru— when it is not at all clear that Tribank's claims can be liquidated anywhere else. This is particularly so since it now also has been established that Peru does not prohibit the liquidation of claims in a forum outside the *Disolución y Liquidación* proceeding, and thus that there is no basis for imposing such a prohibition in the interests of comity.

The Court is of course mindful of the possibility—though not certainty—that the claims Tribank wishes to liquidate may be heard in a proceeding other than the *Disolución y Liquidación* in Peru. But the NBK Representatives have not established that, and it is too important to leave up to chance—particularly where the non-showing has been made by the party with the burden of establishing entitlement to an

---

**34.** Indeed, the *Treco* court observed that "[c]omity probably did not need to be listed as a separate factor because granting relief under § 304 is itself an extension of comity. The subsequent inclusion of comity as a spe- cific factor 'clarif[ied]' and emphasized that Congress wanted courts to afford comity to foreign bankruptcy proceedings." 240 F.3d at 157 n. 7 (brackets in original).

injunction in the form it desires.[35] What is clear, on this record, is that Peruvian law does not prohibit the New York proceeding from going forward, so long as the proceeding is limited to fixing the claims in amount, and thus this Court would not be permitting something in the United States that is prohibited in Peru.

Bankruptcy Code section 101(5) defines a "claim" under United States bankruptcy law. It provides, in relevant part, that "claim" means:

> (A) right to payment, *whether or not such right is reduced to judgment, liquidated, unliquidated,* fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured . . .

(emphasis added). That is, of course, a rather basic principle of modern United States bankruptcy law. Without determining the extent to which there may be exceptions based on a case's particular facts, or other section 304(c) factors that might trump this consideration in a particular case, the Court believes that the "just treatment of all holders of claims," at least as a general matter, requires that those whose claims are presently unliquidated, but which may be very real, be permitted some means to liquidate them and then to obtain whatever recovery or distribution on them is otherwise appropriate.

A foreign nation's failure to permit unliquidated claims to be asserted in its insolvency proceeding has been held to be relevant to the "just treatment of all holders of claims" determination. A decision in a neighbor district, *In re Papeleras Reunidas, S.A.,* 92 B.R. 584 (Bankr.E.D.N.Y. 1988) (Duberstein, C.J.) ("*Papeleras*"), so holds explicitly, and reflects the court's determination that providing the ability to liquidate unliquidated claims is so important that when it is coupled with other procedural failings, a total denial of section 304 relief may be appropriate. In *Papeleras,* the liquidators of a Spanish corporation which was involved in a Spanish bankruptcy sought relief in a proceeding under section 304. There, as here, the Spanish bankruptcy recognized only debts, and did not recognize disputed claims, and provided no means for the claimant with a disputed claim to obtain relief. Indeed, the facts there, insofar as they involved the ability to assert unliquidated claims, were nearly identical to those here:

> Spanish law recognizes only "constitutive" or liquidated, undisputed claims. When a claim is disputed, according to Spanish law, it is not recognized until rendered undisputed.

*Id.* at 590. After comparing and contrasting the Spanish definition of claims with that under United States bankruptcy law, Judge Duberstein held that:

> [T]he Spanish proceedings do not treat Adams as a holder of a claim which it would be entitled to if the bankruptcy case were pending in this country. Deferring to the Spanish proceeding does not afford just treatment to Adams, thus suggesting that this court should dismiss the ancillary proceeding.

*Id.*

In *Papeleras,* the failing just mentioned was accompanied by several others, causing Judge Duberstein to deny section 304 relief in its entirety. *Id.* at 595–596. In *MMG, supra,* another case involving a foreign country's statutory scheme that did not provide for a mechanism for consideration of unliquidated claims (but which did not have failings of the type identified by

---

**35.** Also, if there turned out to be an available Peruvian forum, it would underscore how liquidation of the claim outside of the *Disolu-* *ción y Liquidación* is not offensive to the public policy of Peru.

Judge Duberstein in *Papeleras*), Judge Bernstein of this court found the issuance of a section 304(b)(1) preliminary injunction generally appropriate, and granted section 304 relief, but with a carve-out that nevertheless permitted arbitration proceedings that would enable a litigant to liquidate his claim. *See* 256 B.R. at 555. Judge Bernstein made it clear that the claimant could not, however, "enforce or collect his claims absent further order of this Court." *Id.*

The distinction between permitting a litigation to proceed solely for the purpose of fixing a claim in amount, on the one hand, and permitting it to proceed along with the freedom to execute on assets, on the other, is one that is readily made under U.S. bankruptcy law. The former, conditional, relief is frequently permitted on requests for relief from the stay in United States bankruptcy courts, under Bankruptcy Code section 362(d)(1), particularly where liquidating the claim in the Bankruptcy Court would be impermissible, impractical, or less efficient than the alternative. *See Sonnax Industries, Inc. v. Tri Component Products Corp. (In re Sonnax Industries, Inc.,)*, 907 F.2d 1280, 1286–1287 (2d Cir. 1990) (setting forth standards under which relief from the stay might be granted, under section 362(d)(1), to allow litigation to proceed in the non-bankruptcy court, including, among many others, whether "the liquidation of a claim may be more conveniently and speedily determined in another forum"). Likewise, making that distinction can be appropriate in crafting relief under section 304(b)(1), where the foreign proceeding lacks a mechanism for addressing unliquidated claims, but lacks fairness issues of the type identified by Judge Duberstein in *Papeleras*, and the

Court finds it to be appropriate to do so here.

*Protection of U.S. Claim Holders—Section 304(c)(2)*

This factor plainly is inapplicable here. Tribank is a Cayman Islands corporation that is not licensed to do business in the United States. The Court need not, and does not, decide whether it might grant the NBK Representatives narrower relief, or deny it, if the interests of a U.S. creditor were involved and were prejudiced, because here we are not faced with the needs and concerns of a U.S. creditor.

*Fraudulent Conveyances and Preferences—Section 304(c)(3)*

With respect to this factor, laid out in section 304(c)(3), concerns as to fraudulent conveyances were never applicable, and now that Tribank has undertaken not to grab assets, concerns as to preferences are no longer applicable. The act complained of by Tribank was not a fraudulent conveyance *by* the NBK estate; it was a transfer *to* the NBK estate, with an alleged unjust *enrichment* to the benefit of the NBK estate. Any judgment in the New York Supreme Court would presumably be premised upon the NBK estate having received value corresponding to any Tribank recovery.[36] Thus concerns as to fraudulent conveyances do not appear ever to have been relevant.

With respect to prevention of preferences, however, this factor was a matter of considerable concern to this Court upon its review of the papers; it would have been very troublesome to this Court if Tribank had been able to recover on U.S. assets in full (or in full to the extent of those assets' value), rather than accept the lesser recov-

---

**36.** This Court assumes that insofar as NBK itself is concerned (as contrasted to any individuals or Westfalia), only compensatory damages have been sought and would be awarded. To the extent this is not true, the NBK Representatives may seek further relief from this Court, without prejudice to Tribank's right to be heard in this regard.

ery that other NBK creditors might be required to accept. However now, with Tribank's undertaking that it will, if permitted, merely liquidate its claims in New York and take the result back to Peru, the Court's preference concerns are no longer a factor.

As a consequence, this factor now appears to be irrelevant, too.

*Distribution of Assets Substantially in Accordance with the Order under Title 11—Section 304(c)(4)*

This factor had the potential to be a troublesome one, but Tribank's undertaking that it would not seek to attach or otherwise recover on U.S. assets has made it unnecessary for the Court to determine how it would address this issue in the absence of Tribank's undertaking. The problem arose because of the fact, noted by Dr. Rodríguez, and undisputed by the NBK Representatives, that distributions under the Regime would not simply be made pursuant to a *pari passu* liquidation mechanism, but rather, under mechanisms to satisfy claims by, variously, assigning them to a solvent successor bank or to various trusts.

The problem was aggravated by the fact that this statutory factor, section 304(c)(4), refers not to the order under which these claims, against a bank, might be addressed under *analogous United States law*, but rather, under *title 11*—the Bankruptcy Code.[37] Yet assuming, as this Court does, that Peru, in implementing legislation to strengthen its banking system, might be advancing values that not only are hardly inconsistent with U.S. policy but are values the United States shares, the Court would be inclined, in the interests of comity, to

respect them—especially if U.S. bank regulators might approach similar problems in similar ways.

Ultimately, however, the Court does not need to reach these issues. To the extent this factor would be significant, it would be so because of a concern on Tribank's part that if it were determined to have claims—i.e., after the claims were liquidated—those claims would not be satisfied in a fair way, and Tribank might argue that it therefore should be permitted to attach or execute upon U.S. assets to address that alleged deficiency. But with Tribank having agreed that it no longer seeks to grab U.S. assets, and that after its claims are liquidated, it is content to have its claims addressed in the *Disolución y Liquidación*, this factor no longer is relevant.

### B.

These factors, in their totality (and to the extent they are applicable), militate in favor of granting comity, but not to the extent of jeopardizing the ability of Tribank to liquidate its claims so any claims can be duly considered in the *Disolución y Liquidación* in Peru. Armed with statutory guidelines that "are designed to give the court the maximum flexibility in handling ancillary cases," *Treco*, 240 F.3d at 154, the Court believes that it can and should act to serve both of those ends.

### III.

█ The standards applicable to the issuance of a preliminary injunction in this Circuit are not subject to dispute. To prevail on a motion for a preliminary in-

---

**37.** Thus, it might well be true, as counsel for the NBK Representatives suggested in oral argument, that claims against an insolvent bank or savings & loan in the United States might be dealt with in quite a similar manner.

But the Court did not need to get supplemental briefing or evidence with respect to this in light of Tribank's agreement to subject itself to the Peruvian process after its claim was liquidated.

junction, as Tribank notes,[38] the moving party must show: (a) that it will suffer "irreparable harm in the absence of an injunction" and "(b) either (i) a likelihood of success on the merits or (ii) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." *Zervos v. Verizon New York, Inc.*, 252 F.3d 163, 172 (2d Cir.2001); *see also Polymer Technology Corp. v. Mimran*, 37 F.3d 74, 77–78 (2d Cir.1994), *Feit & Drexler, Inc. v. Drexler (In re Feit & Drexler, Inc.)*, 760 F.2d 406, 415 (2nd Cir.1985).

### A.

As the NBK Representatives note, the dissipation of the finite resources of an insolvent estate constitutes irreparable injury. *See In re Lines*, 81 B.R. 267, 270 (Bankr.S.D.N.Y.1988) (Buschman, J.) ("With respect to irreparable injury, we note that there appears to be little dispute regarding the notion that the premature piecing out of property involved in a foreign liquidation proceeding constitutes irreparable injury"); *In re Rubin*, 160 B.R. 269, 283 (Bankr.S.D.N.Y.1993) (Brozman, C.J.) (same, *quoting Lines); MMG*, 256 B.R. at 555 (same, *citing Lines*).[39] Thus it is clear that the irreparable injury requirement is satisfied with respect to the NBK Representatives' motion insofar as they seek to enjoin any proceedings in New

York that would involve efforts on the part of Tribank or others to attach, execute upon, or otherwise enforce judgments against NBK property.

After briefing was completed, however, Tribank represented to the Court that it would no longer seek to grab assets in New York. The existence of irreparable injury is considerably less clear when the injury consists of the need to defend a litigation in New York that is limited to determining the existence, and amount, of any Tribank claims. *See MMG*, 256 B.R. at 555 (with respect to determination of irreparable harm of defending litigation, as contrasted to having assets taken, "[t]he commencement or continuation of litigation raises a more difficult issue").

It is true, as Judge Bernstein noted in *MMG*, that "[i]rreparable harm may result if the foreign representative is forced to participate in expensive litigation that threatens to drain the assets of the estate ... or [to] open the floodgates to similar litigation," 256 B.R. at 555. Where applicable, such concerns should be addressed. But here, while those concerns are theoretically applicable, the showing that they are substantial has been minimal.

Although there may be times that the defense of complex plenary litigation draws management away from its duties and impairs a debtor's ability to reorganize,[40] the NBK Representatives' showing

---

**38.** Tribank Response ¶ 19.

**39.** The Court also agrees with the NBK Representatives' point that the nationwide injunctive relief that can be afforded in these cases is similar to that provided by the automatic stay under Bankruptcy Code § 362. *See In re Banco Nacional de Obras y Servicios Publicos, S.N.C.*, 91 B.R. 661, 664 (Bankr.S.D.N.Y. 1988) (Brozman, C.J.) (reasons underlying automatic stay under Bankruptcy Code § 362 are identical to those supporting preliminary injunctive relief under Bankruptcy Code section 304). Of course, a corollary of that is

that just as there may be circumstances under which partial relief from the stay is appropriate (e.g., to liquidate a claim that should be liquidated somewhere), there may be circumstances where it is necessary or appropriate to deny a preliminary injunction under section 304 of the full breadth requested.

**40.** *See, e.g., Rickel Home Centers, Inc. v. Baffa (In re Rickel Home Centers, Inc.)*, 199 B.R. 498, 501 (Bankr.D.Del.1996) ("There is irreparable harm to Rickel if no injunction issues. The Baffa discovery will impose significant burdens on [Rickel CFO] Henry and employ-

in this regard has been modest. To be sure, they have made generalized statements such as "litigation in several forums would divert resources and management attention that would otherwise be devoted to expeditiously administering the Peruvian proceeding." But here the litigation in question is not a complicated 10b–5 or mass tort case, where the same people who have been named as defendants in the non-bankruptcy litigation are responsible for the day-to-day affairs of the debtor. Here, at least some, and perhaps most, of the witnesses with the most knowledge of the alleged wrongful conduct are no longer with NBK, and/or are not the ones with responsibility for attending to the *Disolución y Liquidación* in Peru. The NBK Representatives, so far as has been shown to this Court, had nothing to do with the alleged wrongful acts, and presumably would have the responsibility to address all claims, or potential claims, sometime, somewhere, anyway, if claimants' rights to assert claims were not to be wholly foreclosed.

Likewise, any discovery burdens associated with determining whether or not the $8.4 million was actually received by NBK appear to be modest. And if, as the Court believes is only fair, the reorganizing entity is subject to having its claims addressed somewhere, in some forum, it is appropriate in this Court's view to measure only the incremental burden of the defense of those claims, as to which the NBK Representatives have made no real showing.

Finally, the Court has seen nothing to cause it to believe that allowing one litigant to liquidate claims alleging that the debtor is holding $8.4 million of the claimant's money is likely to open floodgates, or that there is any material risk that the

NBK Representatives will be unable to defend, and/or will default, in the Tribank New York Action.

Accordingly, under the particularized facts here, the Court finds irreparable injury to be present with respect to efforts with the purpose or effect of grabbing estate assets, but not with respect to efforts merely to liquidate claims.

### B.

As the NBK Representatives note,[41] where an injunction is sought in support of a foreign proceeding, the second prong—the likelihood of success—is determined with reference to Bankruptcy Code § 304(c), which determines when relief in an ancillary proceeding is available under Bankruptcy Code § 304(b). *MMG*, 256 B.R. at 552. In the Court's view, that would likewise be true if the Court were deciding the NBK Representatives' entitlement under the alternate formulation, "sufficiently serious questions going to the merits to make them a fair ground for litigation."

The Court has already addressed these matters. Here, except insofar as the portion of the NBK Representatives' prayer for relief would prevent even the liquidation of Tribank's claims, the NBK Representatives have made the necessary showing under either standard. With respect to the liquidation of Tribank's claims, the same factors that cause the Court to doubt that the NBK Representatives have shown irreparable injury also cause the Court to doubt that they have shown either a likelihood of success on the merits or serious issues going to the merits, as a matter of the weighing, in the Court's discretion, of section 304(c) factors.

---

ees of Rickel and interfere with the reorganization efforts").

**41.** NBK Motion ¶ 18.

### C.

For the foregoing reasons, the Court finds that the NBK Representatives have made the necessary showing under both of the alternative formulations, insofar as the NBK Representatives seek an order enjoining (1) Tribank from reaching assets and (2) litigants other than Tribank from either commencing litigation or reaching assets, at least (with respect to commencing litigation) without first coming to this Court for permission to do so.

Those factors further cause the Court to conclude, however, that there being insufficient irreparable injury associated solely with the defense of litigation in New York, the NBK Representatives have failed to show entitlement to an injunction that would also prohibit Tribank from liquidating its claims here, so long as Tribank does not try also to reach NBK assets and takes the results of its litigation in the Tribank New York State Action to Peru for implementation.

### Conclusion

For the foregoing reasons, the Court will grant a preliminary injunction providing the relief the NBK Representatives seek (including an injunction against both grabbing of assets and the commencement or continuation of litigation by entities other than Tribank),[42] except that the Court will not enjoin the conduct of the Tribank New York action to the extent that it seeks only a liquidation of the claims, if any, that Tribank has against NBK, and/or a judgment that merely fixes the amount of any debt owed by NBK to Tribank.

The parties are requested to confer among themselves to agree, if possible, on the form of order implementing this ruling.

---

42. The issuance of a preliminary injunction in this respect would be without prejudice to the rights of any person or entity affected thereby to seek what amounts to relief from the stay,

In the absence of an ability to agree, the NBK Representatives may settle an order on three business days' notice by hand or fax, or seven business days' notice by mail. As always, the time to appeal from any such order will run from the date of its entry, and not from the date of this decision.

for cause, in a manner analogous to that available under section 362(d)(1), or the rights of the NBK Representatives to oppose any such request.